The **STATE HIGHWAY COMMISSION OF MISSOURI,**[1] Appellee,

v.

**John A. VOLPE, Secretary of Transportation of the United States, and Casper W. Weinberger, Director of the Office of Management and Budget of the United States, Appellants.**

No. 72-1512.

United States Court of Appeals, Eighth Circuit.

Submitted Jan. 10, 1973.

Decided April 2, 1973.

Rehearing and Rehearing En Banc Denied May 18, 1973.

Stephenson, Circuit Judge, dissented and filed opinion.

1. In addition to several states, the following also submitted an amicus curiae brief on behalf of the appellee: Senator Samuel J. Ervin, Jr., Chairman, Government Operations Committee; Senator James O. Eastland, President Pro Tempore, Chairman, Judiciary Committee; Senator Michael J. Mansfield, Majority Leader; Senator Robert C. Byrd, Assistant Majority Leader; Senator Jennings Randolph, Chairman, Public Works Committee; Senator John L. McClellan, Chairman, Appropriations Committee; Senator Howard W. Cannon, Chairman, Aeronautical & Space Sciences Committee; Senator Thomas F. Eagleton, Chairman, District of Columbia Committee; Senator J. W. Fulbright, Chairman, Foreign Relations Committee; Senator Vance Hartke, Chairman, Veterans' Affairs Committee; Senator Henry M. Jackson, Chairman, Interior & Insular Affairs Committee; Senator Gale W. McGee, Chairman, Post Office & Civil Service Committee; Senator Warren G. Magnuson, Chairman, Commerce Committee; Senator Lee Metcalf, Chairman, Joint Committee on Congressional Organization; Senator John Sparkman, Chairman, Banking, Housing & Urban Affairs Committee; Senator Stuart Symington; Senator Harrison A. Williams, Jr., Chairman, Labor & Public Welfare Committee; Representative J. J. Pickle; Representative Benjamin Rosenthal; Representative Morris K. Udall; Senator John A. Stennis, Chairman, Armed Services Committee; Senator Herman E. Talmadge, Chairman, Agriculture & Forestry Committee; Senator Frank E. Moss, Chairman, Aeronautical & Space Sciences Committee; Senator Hubert H. Humphrey; Senator John V. Tunney; Representative William V. Alexander, Jr.; Representative Robert F. Drinan; and Public Citizen, Inc.

William Appler, Atty., Dept. of Justice, Washington, D. C., for appellants.

Robert Hyder, Jefferson City, Mo., for appellee.

Alan B. Morrison, Washington, D. C., for amicus (Senator Ervin).

Before LAY, HEANEY and STEPHENSON, Circuit Judges.

LAY, Circuit Judge.

The legal issue before us is whether the Secretary of Transportation may defer authority to obligate highway funds previously apportioned to the State of Missouri under the Federal-Aid Highway Act of 1956 [2] when the reasons given for the deferment by the Secretary and the Director of the Budget are the status of the economy and the need to control inflationary pressures. It is conceded that the balance of more than five billion dollars in the highway trust fund is adequate to meet all current requirements and that Missouri is qualified in every respect for its apportionment.[3]

---

2. As amended, 23 U.S.C. § 101 et seq. (1970). The act of deferring authority to obligate funds is generally referred to as "contract controls."

3. Under Section 209 of the Federal-Aid Highway Act of 1956, 23 U.S.C. § 120 note, there is established a Highway Trust Fund. Appropriated into that fund

On June 30, 1971, the State of Missouri filed an amended complaint against the Secretary and the Director of the Office of Management and Budget. The complaint alleged that the Secretary had apportioned 115.7 million dollars in highway funds to Missouri in fiscal 1972, but that he imposed contract controls on (impounded) 21.9 million dollars of that sum. Missouri also complained that funds had been impounded in fiscal 1971 for the same reasons.[4]

The district court, 347 F.Supp. 950, held that the contract controls were beyond the authority conferred on the Secretary by the Federal-Aid Highway Act. It enjoined further withholdings for Missouri for fiscal year 1973; issued a writ of mandamus ordering that the Secretary revoke any contract controls prohibiting Missouri from obligating its full apportionment for fiscal 1973; and entered a judgment declaring that it was not within the discretion of the Secretary to withhold or to defer obligation of highway funds previously apportioned to the State of Missouri for the reasons advanced by the Secretary.

We hold that the action for mandamus was mooted by the Secretary's removal of the contract controls during the pendency of the action [5] but that the court properly granted plaintiff's declaratory judgment.

On appeal, the Secretary argues: (1) that there is no subject matter jurisdiction, (2) that there is no justiciable issue since the case involves only a political question, and (3) that the Secretary possesses discretion under the statute to withhold funds for the stated reasons.

## JURISDICTION

Missouri alleged and the district court so held that it had jurisdiction by virtue of the mandamus statute, 28 U.S.C. § 1361, and by Section 10 of the Administrative Procedure Act, 5 U.S.C. § 701 et seq.

The Secretary urges that mandamus is not a proper basis for jurisdiction since the Highway Act is non-mandatory in nature and that mandamus is only applicable where the duty owed is specific, unequivocal and plainly prescribed.[6] The Secretary further con-

are specified percentages of certain highway user taxes, such as taxes on diesel fuel, gasoline, trucks, tires, etc., which are received into the Treasury. These funds are then used to reimburse the states for expenditures under the Federal-Aid Highway Act.

4. The original action was commenced on August 14, 1970, and related to .highway funds impounded for the fiscal year ending June 30, 1971. This was dismissed as moot since the court found that at the time of trial the contract controls had been removed and that Missouri had been allowed to obligate all funds which had originally been apportioned for that fiscal year and previous fiscal years. However, the court permitted Missouri to file an amended complaint to pursue its claims for the years after the fiscal year ending June 30, 1972.

5. The district court restricted its issuance of mandamus to fiscal year 1973. The date of the district court's hearing was June 19, 1972, and the record shows that on June 15, 1972, Missouri was informed that it would be entitled to obligate all of the funds originally apportioned for the

fiscal year 1973. Thus, on the date of judgment, August 7, 1972, there was no specific duty breached and nothing remained to be ordered for the Secretary to carry out.

6. The possible difficulty with mandamus is the judicial gloss requiring that the duty sought must be a positive command so plainly defined as to be free from doubt. Prairie Band of Pottawatomie Tribe of Indians v. Udall, 355 F.2d 364 (10 Cir. 1966), cert. denied, 385 U.S. 831, 87 S. Ct. 70, 17 L.Ed.2d 67. As the Supreme Court has stated, "where the duty . . . depends upon a statute or statutes the construction or application of which is not free from doubt, it is regarded as involving the character of judgment or discretion which cannot be controlled by mandamus." Wilbur v. United States ex rel. Kadrie, 281 U.S. 206, 219, 50 S.Ct. 320, 324, 74 L.Ed. 809 (1930). Nevertheless, if the Secretary was not delegated any discretionary power to withhold obligational authority for anti-inflationary purposes, the Secretary would be acting outside the scope of his power and it would appear that mandamus was intended to provide a basis for such relief. See

tends that the Administrative Procedure Act is not an independent source of jurisdiction[7] but is only applicable when other grounds of statutory jurisdiction exist. Regardless of these contentions we find an ample jurisdictional basis for adjudication under 28 U.S.C. § 1331(a).

Although § 1331(a) was not specifically pleaded in the complaint, a review of the entire complaint demonstrates that a federal question exists. The plaintiffs sought a judicial construction of the Federal-Aid Highway Act and the amount in controversy obviously exceeded $10,000. In Sikora v. Brenner, 126 U.S.App.D.C. 357, 379 F.2d 134 (1967), the plaintiff alleged jurisdiction under 35 U.S.C. § 145. The district court dismissed for lack of subject matter jurisdiction. However, on appeal, the appellate court found that jurisdiction existed under 5 U.S.C. § 704. The court stated:

"The District Court's jurisdiction was established by the allegations of operative facts bringing the controversy within the scope of the statute conferring jurisdiction on the court. The court's jurisdiction was neither dependent upon nor removable by any reference to or recitation of a statute in the allegations." 379 F.2d at 136.

Moreover, since the complaint clearly establishes that federal question jurisdiction did exist, there is no need for this court to remand in order to amend the pleadings to specifically allege 1331(a) as a basis of jurisdiction. See Norton v. Larney, 266 U.S. 511, 516, 45 S.Ct. 145, 69 L.Ed. 413 (1925). We can assume that the complaint has been amended to conform to this fact and proceed to review the district court's judgment on the merits. See also National Farmers Union Property & Casualty Co. v. Fisher, 284 F.2d 421, 423 (8 Cir. 1960); Parker

---

Peoples v. United States Department of Agriculture, 138 U.S.App.D.C. 291, 427 F.2d 561, 565 (1970). "While the statute [1361] is couched in terms of mandamus action, its liberalizing purpose . . . was intended to permit District Courts generally to issue appropriate corrective orders where Federal officials are not acting within the zone of their permissible discretion but are abusing their discretion or otherwise acting contrary to law . . . ." See also Udall v. Wisconsin, Colorado and Minnesota, 113 U.S. App.D.C. 183, 306 F.2d 790, 793 (1962), cert. denied, 371 U.S. 969, 83 S.Ct. 552, 9 L.Ed.2d 539 (1963). See generally Byse and Fiocca, Section 1361 of The Mandamus And Venue Act Of 1962 And "Nonstatutory" Judicial Review Of Federal Administrative Action, 81 Harv.L. Rev. 308 (1967). However, it is apparent that any issue concerning a writ of mandamus is moot as far as this appeal is concerned. See note 5 supra.

7. Federal courts are apparently divided as to whether Section 10 of the APA confers independent jurisdiction (Section 10 generally provides that "[a] person suffering legal wrong because of agency action . . . is entitled to judicial review thereof," and that "final agency action for which there is no other adequate remedy in a court [is] subject to judicial review."). Compare Brennan v.

Udall, 251 F.Supp. 12 (D.Colo.1966), aff'd, 379 F.2d 803 (10 Cir. 1967), cert. denied, 389 U.S. 975, 88 S.Ct. 477, 19 L. Ed.2d 468, with Arizona State Department of Public Welfare v. Department of HEW, 449 F.2d 456, 464 (9 Cir. 1971), cert. denied, 405 U.S. 919, 92 S.Ct. 945, 30 L.Ed.2d 789 (1972). For a general review of the problem, see Cramton, Nonstatutory Review Of Federal Administrative Action: The Need For Statutory Reform Of Sovereign Immunity, Subject Matter Jurisdiction, And Parties Defendant, 68 Mich.L.Rev. 387, 444 (1970). This court has held that the APA does not confer independent jurisdiction. Twin Cities Chippewa Tribal Council v. Minnesota Chippewa Tribe, 370 F.2d 529, 532 (8 Cir. 1967). Although the Supreme Court has not spoken directly to the issue, its recent cases tend to look favorably upon construing Section 10 as an affirmative grant of jurisdiction. See, e. g., Rusk v. Cort, 369 U.S. 367, 371–372, 82 S.Ct. 787, 7 L.Ed.2d 809 (1962); Abbott Laboratories v. Gardner, 387 U.S. 136, 141, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967); Gardner v. Toilet Goods Ass'n., 387 U.S. 167, 177, 87 S.Ct. 1526, 18 L. Ed.2d 704 (1967) (opinion of Fortas, J.); Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). See generally Byse and Fiocca, supra note 6 at 330–331.

v. Gordon, 178 F.2d 888, 890 n. 2 (1 Cir. 1949).

## JUSTICIABILITY

In view of our finding as to mootness under the mandamus action, we raise the question of whether the declaratory judgment is likewise moot for purposes of this appeal. We decide it is not. It is recognized that "[w]here one of the several issues presented becomes moot, the remaining live issues supply the constitutional requirement of a case or controversy." Powell v. McCormack, 395 U.S. 486, 497, 89 S.Ct. 1944, 1951, 23 L.Ed.2d 491 (1969). Moreover, a court may grant a declaratory judgment even though it declines to issue an injunction or writ of mandamus. Id. at 499, 89 S.Ct. at 1952. An action for declaratory relief satisfies the requirements of a "case or controversy" when it would have significant consequences in determining the extent of any "further relief" deemed necessary if the illegal conduct should be expected to resume in the future. Gautreaux v. Romney, 448 F.2d 731, 736 (7 Cir. 1971).

It is generally held that the voluntary cessation of allegedly illegal conduct does not make a case moot if there is a "reasonable expectation" that the wrong will be repeated. United States v. W. T. Grant Co., 345 U.S. 629, 633, 73 S.Ct. 894, 97 L.Ed. 1303 (1953). See also United States v. Concentrated Phosphate Export Ass'n., Inc., 393 U.S. 199, 203, 89 S.Ct. 361, 21 L.Ed.2d 344 (1968). However, when the actions questioned are those of the government, the mere probability of recurrence must be coupled with a certainty that the impact will fall on the same objecting litigants. Committee to Free the Fort Dix 38 v. Collins, 429 F.2d 807, 812 (3 Cir. 1970); see generally Mootness on Appeal in the Supreme Court, 83 Harv.L. Rev. 1672 (1970). In the instant case, it is conceded by the Secretary that further contract controls will be imposed and that Missouri will most certainly be affected. We therefore find sufficient basis to justify appellate review of the district court's declaratory judgment.

The Secretary asserts the lack of justiciability on the ground that the case presents political questions not appropriate for judicial resolution. Counsel suggests that what is involved is the "[e]xecutive's power to control the rate of expenditure of funds" and that this is a political question. We disagree. The only issue before the district court and this court is the question of statutory construction, i. e., whether the Secretary of Transportation, pursuant to his delegated duties under the Federal-Aid Highway Act, can withhold from the State of Missouri, for the reasons he stated, the authority to obligate funds duly apportioned to the state under the Act. Surely such a determination is within the competence of the courts. Cf. Barlow v. Collins, 397 U.S. 159, 166, 90 S.Ct. 832, 25 L.Ed.2d 192 (1970).

As was recently observed, "[i]n our overall pattern of government the judicial branch has the function of requiring the executive (or administrative) branch to stay within the limits prescribed by the legislative branch." National Automatic Laundry and Cleaning Council v. Shultz, 143 U.S.App.D.C. 274, 443 F.2d 689, 695 (1971). Resolution of the issue before us does not involve analysis of the Executive's constitutional powers. Nothing in the present record demonstrates that the Secretary of Transportation will continue to exercise controls beyond that which judicial construction finds permissible within the statute. To the contrary, at oral argument counsel for the government stated, "I suppose our brief comes as close as it can to conceding that were Congress to make this mandatory, that would be the end of the case. . . . I would say almost certainly that without tending to give away what the White House might decide in any particular statute, that where it is mandated clearly, the Executive would have to spend that money or would spend the money." The issue before us is not whether the Secretary abused his discretion in imposing con-

tract controls but whether the Secretary has been delegated any discretion to so act in the first place. Cf. Constructores Civiles de Centroamerica, S.A. v. Hannah, 148 U.S.App.D.C. 159, 459 F.2d 1183, 1192 (1972). It is difficult to frame the Article III duty of the judicial branch of government under these circumstances in any more meaningful terms than did Mr. Justice Reed in Stark v. Wickard, 321 U.S. 288, 309–310, 64 S. Ct. 559, 88 L.Ed. 733 (1944):

"When Congress passes an Act empowering administrative agencies to carry on governmental activities, the power of those agencies is circumscribed by the authority granted. This permits the courts to participate in law enforcement entrusted to administrative bodies only to the extent necessary to protect justiciable individual rights against administrative action fairly beyond the granted powers. The responsibility of determining the limits of statutory grants of authority in such instances is a judicial function entrusted to the courts by Congress by the statutes establishing courts and marking their jurisdiction. Cf. United States v. Morgan, 307 U.S. 183, 190–191, 59 S.Ct. 795, 83 L.Ed. 1211. This is very far from assuming that the courts are charged more than administrators or legislators with the protection of the rights of the people. Congress and the Executive supervise the acts of administrative agents. The powers of departments, boards and administrative agencies are subject to expansion, contraction or abolition at the will of the legislative and executive branches of the government. These branches have the resources and personnel to examine into the working of the various es-

tablishments to determine the necessary changes of function or management. But under Article III, Congress established courts to adjudicate cases and controversies as to claims of infringement of individual rights whether by unlawful action of private persons or by the exertion of unauthorized administrative power."

Thus, we conclude that the present case presents a justiciable issue capable of judicial resolution.

## THE FEDERAL–AID HIGHWAY ACT

This then brings us to the merits of the controversy—the construction of the Federal-Aid Highway Act as it relates to defining the Secretary's delegated authority. A threshhold requirement is a rudimentary understanding of the Act.

▉ Congress deemed it within the "national interest to accelerate the construction of the Federal-aid highway systems" to serve local and interstate commerce and to enhance national and civil defense. 23 U.S.C. § 101(b) (1970). The objective of the Act was the creation of a National System of Interstate and Defense Highways. The system was to be completed "as nearly as practicable" over the period of twenty years on an expedited construction basis. *Id.*

Based upon specific formulas set forth within the Act, the Secretary is required to apportion among the several states certain sums authorized to be appropriated for expenditure.[8] 23 U.S.C. § 104(b). After the apportionment, the states, through their respective highway departments, are to submit programs of proposed projects based upon the apportioned funds. The Secretary is instructed in Section 105(a) to "act upon programs submitted to him as soon as prac-

---

8. In referring to the above-mentioned formula, former Federal Highway Administrator, F. C. Turner, has observed: "There is absolutely no discretion of any kind in our office with respect to how much any State gets in any of these categories of funds [pursuant to the formula]. The apportionment is specified in the law

and we distribute it right to the dollar." Testimony reported in Hearings on Executive Impoundment of Appropriated Funds Before the Subcommittee on Separation of Powers of the Committee on the Judiciary, 92nd Cong., 1st Sess. at 80 (1971) [hereinafter cited as Senate Hearings].

ticable after the same have been submitted." Section 106(a) then provides that "as soon as practicable after program approval," specific "surveys, plans, specifications, and estimates for each proposed project" will be submitted to the Secretary for his approval. In this regard, Section 106(a) specifically states that in approving the project plans "the Secretary shall be guided by the provisions of section 109 of this title." [9] It is at this stage that the contract controls are imposed, for once a project is approved by the Secretary it "shall be deemed a contractual obligation of the Federal Government for the payment of its proportional contribution thereto." 23 U.S.C. § 106(a). On the basis of this approval, states are permitted to obligate the apportioned funds through the letting of construction contracts, etc. Section 118(b) provides that the sums "available for expenditure" [10] shall remain available for expenditure in that state for a period of two years after the close of the fiscal year for which the sums are authorized, and any funds not expended after that time shall lapse, except that unexpended funds apportioned for the Interstate System shall "immediately be reapportioned among the other States . . . ." The final stage of the Act is the appropriation by Congress of money from the Highway Trust Fund to pay the state the proportional federal share of construction costs incurred in the partial or total completion of the highway projects.

In 1966 President Johnson, in transmitting his proposals to Congress, announced that there would be a deferral of lower priority federal expenditures by approximately $3 billion in order to curb inflation and assure the stability of the economy (H.R. Doc. No. 492, 89th Cong., 2d Sess. (1966)). Thereafter, on November 23, 1966, the Director of the Bureau of the Budget advised the Department of Treasury that the federal highway program would have to bear its share of such deferrals. Accordingly, the program was limited to $3 billion in total project obligations during fiscal year 1967.[11] This was done notwithstanding provisions in the Highway Act authorizing over $4 billion to be apportioned to the states for highway construction.

In light of this, the Secretary of Transportation sought the opinion of the Attorney General of the United States as to the Secretary's authority to defer obligations under the Highway Act. The opinion of Ramsey Clark, Acting Attorney General of the United States, was issued on February 25, 1967. Attorney General Clark concluded that "the Secretary has the power to defer the availability to the States of those funds authorized and apportioned for highway construction which have not, by the approval of a project, become the subject of a contractual obligation on the part of the Federal Government in favor of a State." 42 Op.Att'y Gen. No. 32 (1967).

The essential theses upon which the Secretary defends his authority to impose contract controls under the Federal-Aid Highway Act turns on three arguments: (1) that appropriation acts are permissive in nature and do not provide a specific mandate that the funds authorized to be apportioned must be expended;[12] (2) that there exists no

9. In Section 109 Congress sets forth some ten detailed standards which are to guide the Secretary's approval under § 106(a). These standards relate to construction and safety considerations. See note 16 infra.

10. Under Section 118(b), "expenditure" is defined:
"... Such sums for any fiscal year shall be deemed to be expended if a sum equal to the total of the sums apportioned to the State for such fiscal year and previous fiscal years is covered by

formal project agreements providing for the expenditure of funds authorized by each Act which contains provisions authorizing the appropriation of funds for Federal-aid highways."

11. See testimony of F. C. Turner, Senate Hearings, supra note 8, 59.

12. Although we are not dealing with a general appropriation act, for purposes of discussion we assume that there is no essential difference between a general appropriation and the grant of authority

vested right by the states in the appropriated funds until such time that the Secretary gives his approval; and (3) that the language of Section 101(c) is precatory and although expressing Congress' "desire" and "policy" that highway funds not be impounded, the terms of the statute are not mandatory.

 We find these arguments unavailing. The claim that a general appropriation act is deemed permissive in nature as far as it constitutes a mandate to expend funds has not escaped criticism.[13] Nevertheless, assuming the proposition to be true, it still does not provide a bottom on which to premise either a direct or implied authorization within the Federal-Aid Highway Act to administer contract controls. For although a general appropriation act may be viewed as not providing a specific mandate to expend *all* of the funds appropriated, this does not *a fortiori* endow the Secretary with the authority to use unfettered discretion as to when and how the monies may be used. The Act circumscribes that discretion and only an analysis of the statute itself can dictate the latitude of the questioned discretion. Civil Aeronautics Board v. Delta Air Lines, Inc., 367 U.S. 316, 322, 81 S.Ct. 1611; 6 L.Ed.2d 869 (1961); Federal Trade Commission v. National Lead Co., 352 U.S. 419, 428, 77 S.Ct. 502, 1 L. Ed.2d 438 (1957); Stark v. Wickard, 321 U.S. 288, 309, 64 S.Ct. 559, 88 L. Ed. 733, (1944); Pentheny, Ltd. v. Government of the Virgin Islands, 360 F.2d 786, 790 (3 Cir. 1966).

 The second contention raised by the Secretary is that the states have no vested interest in the funds at the time the Secretary exercises his contract control. This argument is premised on Section 106(a) of the Act which states that approval of the Secretary is a prerequisite to the contractual obligation of the United States. It is, therefore, urged that the statute is not mandatory and that the Secretary has the authority to withhold his approval up to two years time.[14] Assuming arguendo that the states have no vested right in the funds until such time as the Secretary approves the specific projects, we fail to see that this provides a basis

---

to apportion funds to the respective states under the Federal-Aid Highway Act. The actual appropriation of money under the statute is ministerial. It does not occur until monies are appropriated to be paid from the trust fund to reimburse the states for construction already completed under the Act. See Section 209(f) of the Federal-Aid Highway Act of 1956, 70 Stat. 397, 23 U.S.C. § 120 note.

13. See generally Stassen, Separation Of Powers And The Un-Common Defense: The Case Against Impounding Of Weapons System Appropriations, 57 Geo.L.J. 1159, 1181, n. 117 (1969); Ramsey, Impoundment By The Executive Department Of Funds Which Congress Has Authorized It To Spend Or Obligate, Legislative Research Service (Library of Congress) at 15 (1968); Davis, Congressional Power To Require Defense Expenditures, 33 Ford.L.Rev. 39, 55 (1964).

14. In this connection, it should be stated that the Secretary urges that his controls ordinarily involve only five months deferral and that impact on the federal highway program is not substantial. The latter fact is disputed. For example, the House Public Works Committee has observed:

"Cutbacks and freezes on the availability of highway trust fund money have been invoked by the executive branch on various occasions during the past few years, allegedly as an anti-inflationary measure, even though funds were and are available in the trust fund to meet expenditure resulting from the obligation of such funds. This curb-against-inflation argument is without merit. The resulting delays in construction inevitably mean that the costs will be greater. This stop-start manipulation of the highway program, with the uncertain position into which contractors, laborers, and State highway programers are put, cannot but help to boost the ultimate cost of the program." H.R.Rep.No.91–1554, 91st Cong., 2d Sess. (1970); U.S.Code, Cong. & Adm.News at 5401 (1970). Whether it does or does not clearly falls outside our judicial duty here—we look to the statute and not to the result of the Secretary's action in order to determine his lawful authority.

for finding that the Secretary has lawful discretion to *withhold his approval* of projects for reasons not contemplated within the Act.[15]

15. Although we find it unnecessary to decide, a reasonable construction of Section 118(a) is contrary to the Secretary's argument that the states have no inchoate interest whatsoever in the funds so apportioned. Section 118(a) provides:

"§ 118. Availability of sums apportioned.

"(a) On and after the date that the Secretary has certified to each State highway department the sums apportioned to each Federal-aid system or part thereof pursuant to an authorization under this title, or under prior Acts, such sums *shall be available for expenditure under the provisions of this title.*" (Emphasis ours.)

The phrase "shall be available for expenditure" is indicative of a Congressional intent that the money so apportioned may be fully obligated by the states. This can perhaps best be demonstrated by analogizing to other acts which contain somewhat similar language. For instance, in the Medical Facilities Construction and Modernization Amendments of 1970 (Hill-Burton Act), Congress stated in Section 601:

"TITLE VI—AVAILABILITY OF APPROPRIATIONS

"Sec. 601. Notwithstanding any other provision of law, unless enacted after the enactment of this Act expressly in limitation of the provisions of this section, *funds appropriated for any fiscal year* ending prior to July 1, 1973, to carry out any program for which appropriations are authorized by the Public Health Service Act (Public Law 410, Seventy-eighth Congress, as amended) or the Mental Retardation Facilities and Community Mental Health Centers Construction Act of 1963 (Public Law 88–164, as amended) *shall remain available for obligation and expenditure until the end of such fiscal year.*" (Emphasis ours.) H.R. 11102, 91st Cong., 2d Sess. (1970); U.S.Code Cong. & Admin.News, 419.

The Conference Committee Report explained the purpose of Section 601:

"AVAILABILITY OF APPROPRIATIONS

"The Senate amendment would have provided that funds appropriated for any fiscal year to carry out any program under the Public Health Service Act, the Mental Retardation Facilities and Community Mental Health Centers Construction Act of 1963, certain acts relating to Indian health programs, the Vocational Rehabilitation Act, the Clean Air Act, the Solid Waste Disposal Act, and title V of the Social Security Act would remain available for obligation and expenditure until the end of the fiscal year for which appropriated.

"The conference substitute is the same as the Senate amendment, except that it is limited to funds appropriated for fiscal years ending before July 1, 1973, and applies only to funds appropriated to carry out programs under the Public Health Service Act or the Mental Retardation Facilities and Community Mental Health Centers Construction Act of 1963. *The purpose of this amendment is to prevent administratively imposed freezes, reductions, and rollbacks from applying to health programs authorized under these acts.* Where a program authorizes availability of appropriations for more than one fiscal year, and funds are appropriated to cover more than one fiscal year, the conferees intend that the amendment shall apply to the entire period covered by the appropriations." (Emphasis ours.) H.R.Rep. No. 91–1167, 91st Cong., 2d Sess. (1970); U.S.Code Cong. & Adm.News at 3369 (1970).

President Nixon vetoed this bill and in his message to Congress he recognized that the "shall be available for obligation and expenditure" language of Section 601 was mandatory in nature. His veto message stated in pertinent part:

"One of the most unacceptable provisions of the bill is in Section 601. Here, the Congress insists that funds appropriated for any fiscal year through 1973 to carry out the programs involved must be spent. In addition to restricting flexibility in management of Federal expenditures, this provision would interfere with my ability to comply with the limitation on total 1971 spending that has already passed the House of Representatives and has been reported by the Senate Appropriations Committee." Public Papers of the President, Richard Nixon, 1970 at 513–514. Congress subsequently passed this bill over the President's veto. See 42 U.S.C. § 201 note (1970).

In 1968, Congress enacted the Vocational Education Amendments bill. Included in that legislation was the following provision:

"AVAILABILITY OF APPROPRIATIONS

"Sec. 406. Notwithstanding any other provision of law, unless expressly in

The remaining argument of the Secretary is that Section 101(c) of the Act demonstrates that Congress deems impoundment of funds permissive. Section 101(c) specifically provides:

"(c) It is the sense of Congress that under existing law no part of any sums authorized to be appropriated for expenditure upon any Federal-aid system which has been apportioned pursuant to the provisions of this title shall be impounded or withheld from obligation . . . ."

The Secretary urges that "the sense of Congress" language is precatory and simply expresses the wishes of Congress rather than a specific mandate of proscription. Assuming for the moment that this be correct, we find the argument still not controlling the issue before us. The fundamental issue is whether the Secretary possesses direct or implied authority to exercise contract controls for the reasons advanced here. Such authority, if it exists at all, must be gleaned from the language of the Act itself.

We turn then to an analysis of the statute. At the outset we note that in legislating the Federal-Aid Highway Act, Congress was acting under Article I, § 8 wherein it is given its express constitutional authority to establish "post Roads." After granting several additional powers to Congress, Article I, § 8 concludes by setting forth that Congress may "make all Laws which shall be necessary and proper for carrying into Execution the foregoing Powers, and all other Powers vested by this Constitution in the Government of the United States, or in any Department or Office thereof." It seems reasonable to say that until and unless Congress acted under Article I, neither the Secretary nor anyone else within the Executive branch of the government could build a federally aided highway system. The only branch of government which has the constitutional power to build roads is the only one which has the authority to dictate the terms under which the construction can be carried out. It should require no citation of authority to reaffirm the proposition that the Secretary's authority is limited to carrying out the law according to its terms.

In construing the statute, we adhere to the basic canon of construction observed in Richards v. United States:

"We believe it fundamental that a section of a statute should not be read in isolation from the context of the whole Act, and that in fulfilling our responsibility in interpreting legislation, 'we must not be guided by a single sentence or member of a sentence,

limitation of the provisions of this title, funds appropriated for any fiscal year to carry out any of the programs to which this title is applicable shall remain available for obligation until the end of such fiscal year." Section 406 of the Vocational Education Amendments of 1968, 82 Stat. 1094, 20 U.S.C. § 1226 (1970).

Although the committee reports do not satisfactorily explain this section, comments during debate on the floor indicate that the language of Section 406 was intended to prevent the withholding of any funds. For example, Senator Morse, the second ranking member of the Committee on Labor and Public Welfare which reported out the bill, stated:

"The language of section 406 simply requires that appropriations for any fiscal year for education programs which constitute a new obligational authority shall remain available for obligation until the end of the fiscal year for which they are appropriated. *This section would override any statutory authority the President might have to prevent by affirmative act the obligation of fiscal year 1969 appropriations.*" 114 Cong. Rec. 29014 (1968) (Emphasis ours.). See also the remarks of Representatives Mahon and Perkins, Chairmen of the House Appropriations Committee and the Education and Labor Committee, respectively, at 114 Cong.Rec. 29480–29481 (1968). Thus, other instances where language similar to Section 118 (a)'s "shall be available for expenditure" lend support to the conclusion that once authorization for apportionment was given, Congress intended to mandate that a state's interest in the apportioned funds was at least sufficient to preclude the imposition of any contract controls.

but [should] look to the provisions of the whole law, and to its object and policy.'" 369 U.S. 1, 11, 82 S.Ct. 585, 591, 7 L.Ed.2d 492 (1962).

And as stated in 2 Sutherland, Statutory Construction § 2802, at 215 (3d ed. 1943), "[t]he statute should be construed according to its subject matter and the purpose for which it was enacted." Over a century ago, Lord Campbell noted, "[i]t is the duty of the Courts of Justice to try to get at the real intention of the Legislature by carefully attending to the *whole scope* of the statute to be construed." (Emphasis ours.) Liverpool Borough Bank v. Turner, 45 Eng. Repr. 715, 718 (1860), aff'd, 70 Eng. Repr. 703. See generally Thompson v. Clifford, 132 U.S.App.D.C. 351, 408 F.2d 154, 158 (1968); United States v. St. Regis Paper Co., 355 F.2d 688, 692 (2

Cir. 1966); Joanna Western Mills Co. v. United States, 311 F.Supp. 1328, 1335 (Cust.Ct.1970).

 Under the Federal-Aid Highway Act Congress has provided for a coherent scheme of statutory duties relating to the Secretary of Transportation. While the Secretary is given the discretion to approve or disapprove a state highway program under the statute, nevertheless he must act within *specific* directions relating to efficiency, safety and overall compliance with the Act itself. Within Sections 105(a) and and 106(a), the Secretary is given the discretion to approve a state's programs and projects, respectively. However, in both instances the statute sets out detailed considerations designed to guide the Secretary's approval.[16] In this re-

16. Section 105 provides in pertinent part:

"(b) In approving programs for projects on the Federal-aid secondary system, the Secretary shall require, except in States where all public roads and highways are under the control and supervision of the State highway department, that such project be selected by the State highway department and the appropriate local officials in cooperation with each other.

"(c) In approving programs for projects on the Federal-aid primary system, the Secretary shall give preference to such projects as will expedite the completion of an adequate and connected system of highways interstate in character.

"(d) In approving programs for projects on the Federal-aid urban system, the Secretary shall require that such projects be selected by the appropriate local officials and the State highway department in cooperation with each other.

"(e) In approving programs for projects under this chapter, the Secretary may give priority of approval to, and expedite the construction of, projects that are recommended as important to the national defense by the Secretary of Defense, or other official authorized by the President to make such recommendation.

"(f) In approving programs for projects on the Federal-aid systems pursuant to chapter 1 of this title, the Secretary shall give priority to those projects which incorporate improved standards and features with safety benefits.

"(g) In preparing programs to submit in accordance with subsection (a) of this

section, the State highway departments shall give consideration to projects providing direct and convenient public access to public airports and public ports for water transportation, and in approving such programs the Secretary shall give consideration to such projects."

Section 109 provides:

"(a) The Secretary shall not approve plans and specifications for proposed projects on any Federal-aid system if they fail to provide for a facility (1) that will adequately meet the existing and probable future traffic needs and conditions in a manner conducive to safety, durability, and economy of maintenance; (2) that will be designed and constructed in accordance with standards best suited to accomplish the foregoing objectives and to conform to the particular needs of each locality.

"(b) The geometric and construction standards to be adopted for the Interstate System shall be those approved by the Secretary in cooperation with the State highway departments. Such standards, as applied to each actual construction project, shall be adequate to enable such project to accommodate the types and volumes of traffic anticipated for such project for the twenty-year period commencing on the date of approval by the Secretary, under section 106 of this title, of the plans, specifications, and estimates for actual construction of such project. The right-of-way width of the Interstate System shall be adequate to permit construction of projects on the Interstate System to

gard, it is clear that Congress did contemplate that the Secretary exercise administrative expertise to see that the apportioned funds are not expended on projects which fail to meet *reasonable* standards of cost. Such administrative

such standards. Such standards shall in all cases provide for at least four lanes of traffic. The Secretary shall apply such standards uniformly throughout all the States.

"(c) Projects on the Federal-aid secondary system in which Federal funds participate shall be constructed according to specifications that will provide all-weather service and permit maintenance at a reasonable cost.

"(d) On any highway project in which Federal funds hereafter participate, or on any such project constructed since December 20, 1944, the location, form and character of informational, regulatory and warning signs, curb and pavement or other markings, and traffic signals installed or placed by any public authority or other agency, shall be subject to the approval of the State highway department with the concurrence of the Secretary, who is directed to concur only in such installations as will promote the safe and efficient utilization of the highways.

"(e) No funds shall be approved for expenditure on any Federal-aid highway, or highway affected under chapter 2 of this title, unless proper safety protective devices complying with safety standards determined by the Secretary at that time as being adequate shall be installed or be in operation at any highway and railroad grade crossing or drawbridge on that portion of the highway with respect to which such expenditures are to be made.

"(f) The Secretary shall not, as a condition precedent to his approval under section 106 of this title, require any State to acquire title to, or control of, any marginal land along the proposed highway in addition to that reasonably necessary for road surfaces, median strips, gutters, ditches, and side slopes, and of sufficient width to provide service roads for adjacent property to permit safe access at controlled locations in order to expedite traffic, promote safety, and minimize roadside parking.

"(g) The Secretary shall issue within 30 days after the day of enactment of the Federal Aid Highway Act of 1970 guidelines for minimizing possible soil erosion from highway construction. Such guidelines shall apply to all proposed projects with respect to which plans, specifications, and estimates are approved by the Secretary after the issuance of such guidelines.

"(h) Not later than July 1, 1972, the Secretary, after consultation with appropriate Federal and State officials, shall submit to Congress, and not later than 90 days after such submission, promulgate guidelines designed to assure that possible adverse economic, social, and environmental effects relating to any proposed project on any Federal-aid system have been fully considered in developing such project, and that the final decisions on the project are made in the best overall public interest, taking into consideration the need for fast, safe and efficient transportation, public services, and the costs of eliminating or minimizing such adverse effects and the following:

"(1) Air, noise, and water pollution;

"(2) destruction or disruption of man-made and natural resources, aesthetic values, community cohesion and the availability of public facilities and services;

"(3) adverse employment effects, and tax and property values losses;

"(4) injurious displacement of people, businesses and farms; and

"(5) disruption of desirable community and regional growth.

Such guidelines shall apply to all proposed projects with respect to which plans, specifications, and estimates are approved by the Secretary after the issuance of such guidelines.

"(i) The Secretary, after consultation with appropriate Federal, State, and local officials, shall develop and promulgate standards for highway noise levels compatible with different land uses and after July 1, 1972, shall not approve plans and specifications for any proposed project on any Federal-aid system for which location approval has not yet been secured unless he determines that such plans and specifications include adequate measures to implement the appropriate noise level standards.

"(j) The Secretary, after consultation with the Administrator of the Environmental Protection Agency, shall develop and promulgate guidelines to assure that highways constructed pursuant to this title are consistent with any approved plan for the implementation of any ambient air quality standard for any air quality control region designated pursuant to the Clean Air Act, as amended."

See also 23 C.F.R. §§ 1.15–1.30 (1972).

stewardship is implicit within Section 106(d) of the Act which reads:

"(d) In such cases as the Secretary determines advisable, plans, specifications, and estimates for proposed projects on any Federal-aid system shall be accompanied by a value engineering or other cost reduction analysis."

Moreover, the Secretary is authorized to oversee the letting of contracts (23 U.S.C. § 112) and to insure that prevailing wage rates are maintained (23 U.S.C. § 113). We find nothing within these provisions of the Act which explicitly or impliedly allows the Secretary to withhold approval of construction projects for reasons remote and unrelated to the Act. The statute specifically sets out when the Secretary is justified in withholding funds from the states. This authority generally relates to guarding against the depletion of the Highway Trust Fund. The Secretary is given the express power to withhold obligational authority for a given fiscal year if the Secretary of Treasury determines that "the amounts which will be available in such fund . . . will be insufficient to defray the expenditures which will be required as a result of the apportionment to the States of the amounts authorized . . . ." Section 209(g) of the Federal-Aid Highway Act of 1956, 70 Stat. 400, 23 U.S.C. § 120 note. See also 23 U.S.C. § 101(c).

As has cogently been observed, "[w]here Congress has consistently made express its delegation of a particular power, its silence is strong evidence that it did not intend to grant the power." Alcoa Steamship Co. v. Federal Maritime Commission, 121 U.S.App.D.C. 144, 348 F.2d 756, 758 (1965). Cf. Zuber v. Allen, 396 U.S. 168, 183, 90 S.Ct. 314, 24 L.Ed.2d 345 (1969); Addison v. Holly Hill Fruit Products, Inc., 322 U.S. 607, 617, 64 S.Ct. 1215, 88 L.Ed. 1488 (1944). To reason that there is implicit authority within the Act to defer approval for reasons totally collateral and remote to the Act itself requires a strained construction which we refuse to make. It is impossible to find from these specific grants of authority discretion in the Secretary to withhold approval on projects Congress has specifically directed because of a system of priorities the Executive chooses to impose on all expenditures. The Congressional intent is that the Secretary may exercise his discretion to insure that the roads are well constructed and safely built at the lowest possible cost, all in furtherance of the Act, but when the impoundment of funds impedes the orderly progress of the federal highway program, this hardly can be said to be favorable to such a program. In fact, it is in derogation of it. It is difficult to perceive that Congress intended such a result.

SECTION 118(b)

The Secretary additionally urges that since Section 118(b) provides that the sums are to be available for expenditure for a period of two years before they lapse, it is perfectly legal for him to withhold obligational authority so long as the states receive their full obligational authority within the two-year period. This is not only contradictory of the government's position that the states have no vested interest in the monies authorized, but this misconstrues the intent of Section 118(b) as well. That section provides: "Such sums shall continue available for expenditure *in that state* . . . for a period of two years . . . ." (Our emphasis.) This simply means that the money is to be available for an individual state to use, and if any state does not obligate all their money within the two-year period, then the money will lapse. The statute is not directed at permitting the federal government to withhold the money as it sees fit so long as the states are allowed to obligate the funds within two years. This construction finds support in the legislative history. In the Senate Report to the Federal Aid in the Construction of Rural Post Roads Act, which was the initial federal legislation supporting

highway construction, the following appears:

"Section 3 also provides that the unexpended portions of the appropriations at the close of any fiscal year shall be available for expenditure until the close of the succeeding fiscal year. This will prevent both undue haste in the expenditure of the appropriation *to prevent its being turned back into the Federal Treasury and the defeating of the purpose of the act by failure to adequately and wisely expend it for the purpose of road improvement.* In order that *the States* having no highway departments may not be penalized pending the meeting of their State legislatures, *this section allows them until the close of the third fiscal year succeeding the year for which appropriation was made [in order to arrange for expenditure.]*" (Emphasis ours.) S.Rep. No. 250, 64th Cong., 1st Sess. (1916).

The bracketed language clearly indicates that any expenditures are to be arranged by the states within the two years. Furthermore, in the Conference Report to the Federal-Aid Highway Act of 1956, it is noted that the funds *available* for *expenditure* will lapse if unexpended at the end of the two-year period. In discussing the availability for expenditure, the Committee observed:

"(f) Availability for expenditure. —The language of the House bill (sec. 108(h)) and the conference agreement (sec. 108(f)) are identical in this respect. The conferees took note of the fact that *some States have not yet obligated* all of the funds previously apportioned to them under the authorizations contained in the Federal-Aid Highway Act of 1954, wherein the matching ratio is 60–40 instead of the more liberal 90–10 ratio provided in the conference agreement. It is intended by the conferees that the Secretary of Commerce will take such steps as may be necessary to insure that *each State shall utilize all 60–40*

*funds apportioned to it before the lapse period and that no State will be permitted to deliberately lapse* any of the 60–40 funds in order to substitute therefor the more favorable 90–10 funds and thereby increase the total Federal funds going into any State for the Interstate System." (Emphasis ours.) H.R.Rep. No. 2436, 84th Cong., 2d Sess. (1956); U.S. Code, Cong. & Adm.News at p. 2896 (1956).

Thus, there is a clear indication that Congress intended that the obligation of funds within the lapse period be a continuing duty of the states. Once this premise is recognized, it is not persuasive for the Secretary to argue that the lapse period of 118(a) was intended for the benefit of the Secretary. The government position is similarly weakened by reference to Section 101(b) of the Act where it is declared to be in the national interest to accelerate the construction of the highway system. As noted earlier, this same theme appears throughout the Act wherein Congress directs the states and the Secretary to act "as soon as practicable."

SECTION 101(c)

 When the provisions of the Federal-Aid Highway Act are considered as a whole, it is apparent that the Secretary does not have the authority to withhold funds for anti-inflationary purposes. This construction is supported by Section 101(c). After the Attorney General's opinion [17] in 1967 ruled that impoundment of highway funds was permissible under the Highway Act, Congress passed Section 101(c) specifically saying that it "was the sense of Congress that under existing law" the Secretary was not to impound funds under the Federal-Aid Highway Act. Upon subsequent amendment to the Act in 1970, the House Report significantly stated:

"It has been clearly demonstrated that the Federal-aid highway program can

---

17. 42 Op. Att'y Gen. No. 32 (1967). The Secretary has to a large extent incorporated the reasoning of the Attorney

General's opinion in its brief in this court.

operate successfully and efficiently only so long as its planning and programming can be based on an assured comparatively long-term level of financing.

"*The withholding of highway trust funds as an anti-inflationary measure is a clear violation of the intent of the Congress as expressed in section 15 of the Federal-Aid Highway Act of 1968. We again wish to emphasize the clear legislative intent that funds apportioned shall not be impounded or withheld from obligation . . . .*" (Emphasis ours.) H.R.Rep. No. 91–1554, 91st Cong., 2d Sess. (1970); U.S. Code, Cong. & Adm.News at p. 5401 (1970).

However, assuming, as the Secretary contends, that the "sense of Congress" language is precatory and merely reflects a policy statement, nevertheless, such language can be useful in resolving ambiguities in statutory construction. See Connecticut Light & Power Co. v. Federal Power Commission, 324 U.S. 515, 527, 65 S.Ct. 749, 89 L.Ed. 1150 (1945); 2 Sutherland, Statutory Construction § 4820 (3d ed. 1943). Moreover, Section 101(c) takes on an added significance since it is a Congressional interpretation of prior law—for the words used are "it is the sense of Congress that under existing law." And as the most recent pronouncement of the Supreme Court observes: "Subsequent legislation declaring the intent of an earlier statute is entitled to great weight in statutory construction." Red Lion Broadcasting Co. v. Federal Communications Commission, 395 U.S. 367, 380–381, 89 S.Ct. 1794, 1801, 23 L.Ed.2d 371 (1969). Accord, Federal Housing Administration v. The Darlington, Inc., 358 U.S. 84, 90, 79 S.Ct. 141, 3 L. Ed.2d 132 (1958); Banco Nacional de Cuba v. Farr, 383 F.2d 166, 175 (2 Cir. 1967), cert. denied, 390 U.S. 956, 88 S. Ct. 1038, 20 L.Ed.2d 1151 (1968). But see Waterman Steamship Corp. v. United States, 381 U.S. 252, 85 S.Ct. 1389, 14 L.Ed.2d 370 (1965).

Thus, we find Section 101(c) merely *corroborates* what, as was pointed out earlier, the statute as a whole already provides—that apportioned funds are not to be withheld from obligation for purposes totally unrelated to the highway program.[18]

Finally, the Secretary urges that it is significant that Congress has failed to pass subsequent legislation specifically prohibiting the Secretary from withholding obligational authority. We deem this another straw in the wind.

When attempting to determine the meaning and intent of a particular statute, it is generally held that the rejection by Congress of amendments or other legislation relating to the statute in question is "not conclusive as to the meaning of the bill in the unamended form. . . . It is, however, a circumstance to be weighed along with others when choice is nicely balanced." Fox v. Standard Oil Co., 294 U.S. 87, 96,

18. The Secretary also urges that the right to defer funds is implicit in the precatory language of Section 101(c) since Section 101(d), relating to other expenditures under the Act, uses mandatory language and Section 101(c) does not. Section 101(d) provides:

"No funds authorized to be apportioned from the Highway Trust Fund shall be expended by or on behalf of any Federal department, agency, or instrumentality other than the Federal Highway Administration unless funds for such expenditure are identified and included as a line item in an appropriation Act and are to meet obligations of the United States heretofore or hereafter incurred under this title attributable to the construction of Federal-aid highways or highway planning, research, or development, or as otherwise specifically authorized to be appropriated from the Highway Trust Fund by Federal-aid highway legislation."

The simple explanation for the difference in language is that subsection (c) refers to "existing law" whereas subsection (d) does not. No significance was intended by the conferees. See H.R.Rep.No.91–1780, 91st Cong., 2d Sess. (1970); U.S. Code Cong. & Adm.News at 5459 (1970). H.R.Rep.No.91–1554, 91st Cong., 2d Sess. (1970); U.S.Code Cong. & Adm.News at 5401–5402 (1970).

55 S.Ct. 333, 337, 79 L.Ed. 780 (1935). However, under the facts of the instant case, these rejections by Congress are of even lesser consequence, for the necessary balance is missing. In *Fox* the amendment was debated and rejected by a vote of the entire Senate. In the present case, there were four principal bills introduced which would have prohibited the Secretary from impounding any highway funds—S. 4049, 90th Cong., 2d Sess. (1968); H.R. 1214, 91st Cong., 1st Sess. (1969); S. 3877, 92d Cong., 2d Sess. (1972); and S. 3939, 92d Cong., 2d Sess. (1972). Of these four bills, the first three have never even been reported out of committee.[19] There have been no committee hearings, reports, floor debates, or floor votes on these measures. They simply died in committee for no explained reason. The last bill, S. 3939, contained an alternative procedure which would have precluded the Secretary from withholding obligational authority. Only the Senate Report contained this procedure—it was not part of the House Report.[20] When the Conference Report was submitted the alternative procedure was dropped altogether, with no concomitant explanation. H.R.Rep.No. 92–1619, 92d Cong., 2d Sess.(1972).[21]

Under such circumstances, there is no way of ascertaining why these various bills were not enacted. The Secretary argues that Congress did not want to proscribe the Secretary's alleged authority to withhold obligational authority. But it is equally plausible that Congress felt that the bills were unnecessary—that it was their understanding that the Federal-Aid Highway Act as then existing already precluded any deferral of obligational authority. When the rejection of these bills is viewed in this light, this legislative history is of no assistance in construing the Act. As the Supreme Court noted in Order of Railway Conductors of America v. Swan, 329 U.S. 520, 529, 67 S.Ct. 405, 410, 91 L.Ed. 471 (1947):

> "Finally, petitioners point out that Congress has failed to amend § 3, First (h), so as specifically to exclude 'yardmasters and other subordinate officers' from the jurisdiction of the First Division, despite the introduction of two bills to that effect in the Senate in 1940 and 1941. *These bills were sent to an appropriate committee, but were never reported out. It does not appear whether the bills died because they were thought to be unnecessary or undesirable. No hearings were held; no committee reports were made. Under such circumstances, the failure of Congress to amend the statute is without meaning for purposes of statutory interpretation.*" [22]

19. See CCH, Congressional Index, for years 1968, 1969 and 1972.

20. See S.Rep. No. 92–1081, 92d Cong., 2d Sess. (1972); H.R.Rep. No. 92–1443, 92d Cong., 2d Sess. (1972).

21. The floor debate on the Conference Report indicates that the most controversial provision of S. 3939 concerned using funds from the Highway Trust Fund for purposes of funding a mass transit program. It is apparent that the inability of the conferees to agree on this point also prevented several other provisions of the bill from being considered on their merits. See 118 Cong.Rec. S. 18351 *et seq.* (1972); 118 Cong.Rec. S. 18636 *et seq.* (1972); 118 Cong.Rec. H. 10341 *et seq.* (1972). Although the Conference Report was reported out, Congress adjourned before completing final action on this bill.

22. In accord is Chief Justice Warren's observation in United States v. Wise, 370 U.S. 405, 411, 82 S.Ct. 1354, 1358, 8 L.Ed.2d 590 (1962):

> "The appellee seeks succor in the subsequent legislative history accompanying attempts to amend the Sherman Act between 1890 and 1914. He particularly relies upon H.R. 10539, 56th Cong., 1st Sess. (1900). This bill would have expressly included corporate officers and agents in the definition of 'persons' found in § 8. The report accompanying that bill stated that the existing law did not subject agents, officers, and attorneys to penalties. H.R.Rep. No. 1506, 56th Cong., 1st Sess. However, statutes are construed by the courts with reference to the circumstances existing at the time of the passage. *The interpretation placed upon an existing*

See also Arnold Tours, Inc. v. Camp, 472 F.2d 427 (1 Cir. 1972); Miller v. United States, 180 Ct.Cl. 872, 877 (1967); Brannan v. Stark, 87 U.S.App.D.C. 388, 185 F.2d 871, 883 (1950), aff'd, 342 U.S. 451, 72 S.Ct. 433, 96 L.Ed. 497 (1952); see generally Hart, Comment on Courts and Lawmaking, in Paulsen, ed. Legal Institutions Today and Tomorrow 45–47 (The Centennial Conference Volume of the Columbia Law School, 1959); Folsom, Legislative History 38 (1972).

## ANTI-DEFICIENCY ACT

■ Although the applicability of the Anti-Deficiency Act, 34 Stat. 49, as amended, 64 Stat. 765, 31 U.S.C. § 665(c), was not argued on this appeal, the conclusion we reach is not at variance with the provisions of that Act. Section 665(c) (2) allows the Bureau of the Budget (now OMB), when apportioning appropriation funds, to set up reserves (i.e., withhold the funds) in order "to provide for contingencies, or to effect savings whenever savings are made possible by or through changes in requirements, greater efficiency of operations, or other developments subsequent to the date on which such appropriation was made available." However, the Act goes on to point out that the reserves may only be established when the funds *"will not be required to carry out the purposes of the appropriation concerned . . . ."* (Emphasis ours.) The legislative history is emphatic in noting that this power to withhold funds cannot be used if it would jeopardize the policy of the statute.

"It is perfectly justifiable and proper for all possible economies to be effected and savings to be made, *but there is no warrant or justification for the thwarting of a major policy of Congress by the impounding of funds.* If this principle of thwarting the will

*statute by a subsequent group of Congressmen who are promoting legislation and who are unsuccessful has no persuasive significance here. . . . Logically, several equally tenable inferences could be drawn from the failure of the Congress to adopt an*

of Congress by the impounding of funds should be accepted as correct, then Congress would be totally incapable of carrying out its constitutional mandate of providing for the defense of the Nation." (Emphasis ours.) H. R.Rep. No. 1797, 81st Cong., 2d Sess. 311 (1950).

It is thus apparent that any withholding in order to "effect savings" or due to "subsequent events," etc., must be considered in context of not violating the purposes and objectives of the particular appropriation statute. Such purposes and objectives are necessarily violated when one charged with implementing the statute acts beyond his delegated authority.

## CONCLUSION

We conclude that the statutory provisions of the Federal-Aid Highway Act of 1956, as amended, 23 U.S.C. § 101 et seq. (1970), do not expressly or impliedly authorize the Secretary to withhold the authority to obligate apportioned funds where the only reasons are those advanced by the Secretary in this case.

■ As earlier indicated the issuance of the writ of mandamus is now moot and is hereby ordered vacated. The judgment granting declaratory relief in favor of the plaintiff is affirmed. The defendants are hereby enjoined from withholding from the State of Missouri, now and in the future, the authority to obligate its apportioned funds under the Federal-Aid Highway Act for reasons allegedly related to the status of the economy and the need to control inflationary pressures.

Judgment affirmed, as modified.

STEPHENSON, Circuit Judge (dissenting).

I respectfully dissent. It is my view that the district court erred in holding

*amendment in the light of the interpretation placed upon the existing law by some of its members, including the inference that the existing legislation already incorporated the offered change."* (Emphasis ours.)

that the Executive Branch has no discretion to control the rate of obligation of funds apportioned under the Federal-Aid Highway Act. The language of the statute and its historical interpretation clearly demonstrate a deliberate choice by Congress to grant to the Executive discretion in determining the extent to which apportioned funds will be made available for obligation.

The expenditure of funds pursuant to the Federal-Aid Highway Act of 1956 (23 U.S.C. § 101 et seq.) is a step-by-step process. The program involves successive, and distinct, stages of authorizations, apportionments, programs, projects and appropriations. The basic *authorization* for appropriations for the Interstate Highway system is found in section 108(b) of the Federal-Aid Highway Act of 1956. The funds expected to be available with respect to each fiscal year included in these authorizations are then *apportioned* among the states on or before the first day of January preceding the fiscal year for which they are authorized to be appropriated. 23 U.S.C. § 104(a). Funds so apportioned remain available for obligation at any time prior to the close of the second fiscal year after the fiscal year for which they are authorized. 23 U.S.C. § 118(a), (b). After apportionment, however, the states must submit programs for proposed highway projects for approval by the Secretary of Transportation (appellant here) before they may obligate apportioned funds. 23 U.S.C. § 105.[1] Approval of a specific program by the Secretary results in a contractual obligation of the Federal Government. 23 U.S.C. § 106(a). Payments to the states are made pursuant to appropriation acts for reimbursement for work performed. The amount appropriated each year may not exceed the amounts provided for in the authorization act, nor may it exceed the funds available in the Highway Trust Fund.

In the instant case, the Secretary has withheld its approval of proposed projects after authorization and apportionment but before any appropriation has been made by Congress.

While an appropriation act, as contrasted to authorization acts, would seem to be mandatory in its effect, the courts have held that even appropriation acts are permissive in nature and do not in themselves impose an affirmative duty to expend the funds. McKay v. Central Electric Power Cooperative, 96 U.S. App.D.C. 158, 223 F.2d 623, 625 (1955). Historically, there has been considerable support for this construction. For instance, then Senator Truman said in 1943,

"When the Congress appropriates funds it gives the executive branch an *authority* to incur obligations. Certainly none of us hold that we give a mandate to expend the funds appropriated. We expect the funds to be used only where needed, and not in excess of the amount appropriated, to carry out some phase of the law." 89 Cong.Rec. 10362 (emphasis added).

The legislative branch itself pointed out in a Committee Report concerning the 1951 Appropriations Bill, an "appropriation of a given amount for a particular activity constitutes only a ceiling upon the amount which should be expended for that activity." H.Rep. 1797, 81st Cong., 2d Sess., p. 9. As early as 1943 Congress recognized that *authorizing* legislation does not compel the executive

---

1. In an attempt to curtail the Executive's practice of withholding apportioned funds under the Federal-Aid Highway Act, the Senate in 1972 approved a bill S. 3939, 92nd Cong., 2d Sess. (1972), which would eliminate the project-by-project review of the Secretary. It would, in effect, have created a contractual obligation on the Government immediately after funds were apportioned. The Secretary would not then be able to withhold funds by simply not approving proposed projects. See H. Rep. 92–1081, 92nd Cong., 2d Sess. The corresponding House bill contained no such provision. H.Rep. 92–1443, 92nd Cong., 2d Sess. The Conference Committee accepted the House version without the proposed Senate provision. Congress then adjourned prior to final action on the 1972 Federal-Aid Highway Act.

branch to obligate or expend highway funds. *See* House Conf.Rep. 677, 78th Cong., 1st Sess., p. 4 (1943) in regard to § 9 of the Rural Post Roads Act of 1943. The fact is that the presidential practice of withholding authorized and appropriated funds runs at least as far back as 1942. Presidents Roosevelt, Truman, Eisenhower, Kennedy, Johnson, and now Nixon have all practiced it to varying degrees. Miller, Presidential Power to Impound Appropriated Funds: An Exercise in Constitutional Decision Making, 43 North Carolina Law Rev. 502, 513 (1965). Although this practice is not without its critics,[2] it appears to be an established practice. *Id.*, and as Judge Cardozo once stated, "not lightly [to be] vacated is. the verdict of quiescent years." Coler v. Corn Exchange Bk., 250 N.Y. 136, 164 N.E. 882, 884 (1928). *Cf.* Contractors Ass'n of Eastern Pa. v. Secretary of Labor, 442 F.2d 159, 171 (CA3 1971). By implication the practice has received frequent statutory recognition. An example is the Anti-Deficiency Act, 31 U.S.C. § 665(c)(1) which provides that "authorizations to create obligations by contract in advance of appropriations shall be so apportioned as to achieve the most effective and *economical* use thereof." (Emphasis added). And 31 U.S.C. § 701(a)(2) of the same Act provides for reversion of unobligated appropriated funds to the fund from which they originally were derived. If Congress expected full expenditure of funds, it obviously would appear unnecessary to include such a provision. It is, therefore, my view that in the absence of specific statutory language to the contrary, Congress has given the Executive branch the power to withhold authorized but unobligated funds from expenditure.[3]

I now turn to the specific statutory language of the Federal-Aid Highway Act to determine whether Congress has provided a specific mandate to spend authorized but unobligated funds, 23 U.S. C. § 101(c) provides:

> "*It is the sense of Congress* that under existing law no part of any sums authorized to be appropriated for expenditure upon any Federal-Aid system . . . shall be impounded or *withheld from obligation*, for purposes and projects as provided in this title, by any officer or employee in the executive branch of the Federal Government, . . . ." (Emphasis added.)

23 U.S.C. § 101(d) provides in clear mandatory terms:

> "*No funds* authorized to be appropriated from the Highway trust fund *shall* be expended by or on behalf of any Federal department, agency, or instrumentality other than the Federal Highway Administration unless . . . specifically authorized . . . from the Highway Trust Fund by Federal-aid highway legislation." (Emphasis added.)

Sections (c) and (d) were added to the Federal-Aid Highway Act in 1968. Pub.L. 90–495, § 15.[4] It is interesting

---

2. *See generally* Boggs, Executive Impoundment of Congressionally appropriated Funds, 24 U.Fla.L.Rev. 221 (1972); Church, Impoundment of Appropriated Funds: The Decline of Congressional Control over Executive Discretion, 22 Stanford L.Rev. 1240 (1970).

3. Other legislative history supports this conclusion. On several occasions Bills have been introduced into Congress which would have made it unlawful to withhold moneys appropriated by Congress from being promptly applied for the purpose designated in the Federal-Aid Highway Act. H.R. 11441, 85th Cong. 2d Sess. (1958), H.R. 11541, 85th Cong., 2d Sess. (1958), H.R. 11682, 85th Cong., 2d Sess. (1958), S. 3578, 85th Cong., 2d Sess. (1958), H.R. 1254, 86th Cong., 1st Sess. (1960), S. 4049, 90th Cong. 2d Sess. (1968) (an attempt to exempt the Federal-Aid Highway Act from the 1968 inflationary cuts imposed by Congress), H.R. 1214, 91st Cong., 1st Sess. (1969), S. 3877, 92nd Cong., 2d Sess. (1972). *See* footnote 1 supra for the most recent action by Congress in this respect.

4. An examination of the legislative history of §§ (c) and (d) reveals a concern by Congress over the practice of the Executive of impounding or withholding apportioned funds. Apparently in response to a

to note that section (d) as originally enacted in 1968 started with the "It is the sense of Congress" phrase also found in section (c). However, when 23 U.S.C. § 101 was amended to its present form in 1970, the phrase "No funds authorized to be appropriated" was substituted for the "sense of Congress" phrase in section (d) but not in section (c). Pub.L. 91–605, § 107. By reenacting § 101(c) without pertinent modification but amending 101(d) Congress implicitly accepted the non-mandatory construction placed on § 101(c) by the Secretary after receiving Attorney General Clark's opinion [5] in 1967.

1967 Attorney General opinion, 42 Op. Att'y Gen. 32 (1967), the House passed a bill which would have amended 23 U.S. C. § 104 to include a mandatory spending provision. H.Rep.No.1584, 90th Cong., 2nd Sess., p. 11–12. Conf.Rep.No.1799, 90th Cong., 2nd Sess., (1968), U.S.Code Cong. & Admin.News at p. 3537. The Senate did not recommend a specific amendment but did state its opposition to reductions in funds made available for obligation under the Federal-aid highway program which relate directly to the "planning and design of highway projects, the acquisition of rights-of-way necessary for such projects, and the assistance to those who are dislocated or displaced by highway construction projects." S.Rep.No. 1340, 90th Cong., 2nd Sess., (1968), U.S. Code Cong. & Admin.News at p. 3501. The Conference Committee failed to accept the mandatory House language and instead adopted the Senate bill which included the "sense of Congress" phrase. H.Rep. 1799, 90th Cong., 2nd Sess., (1968), U.S. Code Cong. & Admin.News at p. 3537. This resulted in amendments (c) and (d) to 23 U.S.C. § 101. The Conference Report, *Id.*, describes 23 U.S.C. § 101 as the "general declaration of policy" (emphasis added) applicable to Title 23. It is now well established that statements of policy do not add to or alter specific operative provisions of a statute. Sinclair Refining Co. v. Atkinson, 370 U.S. 195, 202, 82 S. Ct. 1328, 8 L.Ed.2d 440 (1962); 42 Op. Att'y Gen. 32 (1967). Since no provision of the Act gives any state a vested right to the apportioned funds prior to approval by the Secretary, and there is no express mandate to the Secretary to approve proposed projects, it is reasonable to conclude that the Secretary has, in his discretion, the authority to withhold unobligated funds.

5. "DEAR MR. SECRETARY: This is in reply to your letter of February 21, 1967, requesting my opinion as to the legality of a reduction in the amount of Federal aid highway funds which may be obligated during the Fiscal Year ending June 30, 1967.

\* \* \* \* \*

479 F.2d—71

An appropriation act thus places an upper and not a lower limit on expenditures. The duty of the President to see that the laws are faithfully executed, under Article II, section 3 of the Constitution, does not require that funds made available must be fully expended. This principle has received statutory recognition in the Anti-Deficiency Act, February 27, 1906, c. 510, sec. 3, 34 Stat. 49 (31 U.S.C. 665(c)), which authorized the executive branch to effectuate savings of appropriated funds, and in 31 U.S.C. § 701, which provides that unexpended appropriated funds shall revert to the Treasury.

Many factors must be weighed by the Executive in determining the extent to which funds should be expended. Consideration must be given not only to legislative authorizations and appropriations but also to such factors as the effect of the authorized expenditures on the national economy and their relation to other programs important to the national welfare.

A situation analogous to the present one arose in the early 1940's when the economy of the United States shifted first to defense and later to war production. At that time President Franklin Delano Roosevelt directed that projects having a lower priority would have to be postponed or even cancelled in spite of the availability of appropriated funds. In response to complaints about the curtailment by the Bureau of the Budget of certain programs of the Agricultural Marketing Administration, President Roosevelt set forth the powers and responsibilities of the executive branch in this area:

'It should, of course, be clearly understood that what you refer to as "the practice of the Bureau [of the Budget] of impounding funds duly appropriated by the Congress" is in fact action by the Chief Executive, and has two purposes. The first purpose is compliance with the Anti-Deficiency Act, which requires that appropriated funds be so apportioned over the fiscal year as to insure against deficiency spending. \* \* \* Secondly, the apportionment procedure is used as a positive means of reducing expenditures and saving money wherever and whenever such savings appear possible.

*Cf.* National Labor Relations Board. v. Gullett Gin Co., 340 U.S. 361, 366, 71 S. Ct. 337, 95 L.Ed. 337 (1951). In a similar vein the Circuit Court of Appeals for the District of Columbia said in 1961:

> "Approval of an administrative interpretation is not lightly to be laid at the door of Congress; but the evidence of awareness by Congress of the . . . interpretation over a very considerable period, during which Congress considered the legislation several times with no change . . . as administratively interpreted cannot be altogether ignored."

Empire State Highway Transp. Ass'n v. Federal Maritime Bd., 110 U.S.App.D.C. 208, 291 F.2d 336, 340 (1961). *Accord,* Norwegian Nitrogen Products Co. v. United States, 288 U.S. 294, 313, 53 S. Ct. 350, 77 L.Ed. 796 (1933).

If Congress intends to mandate to the Executive branch, this should be unambiguously stated in the legislation so the President understands clearly when he has been directed and when he has been given discretionary powers. In this regard, I submit that the phrase "sense of Congress" is only precatory in its effect. The phrase has been the subject of interpretation in two opinions of the United States Attorney General, both construing 15 U.S.C. § 616a. The latest, 42 Op.Att'y Gen. 20 (1965) stated:

> "This section, by expressing the 'sense of Congress' that government agencies 'shall' require the exports to be carried exclusively in United States vessels, is not mandatory and does not preclude the Maritime Administration from permitting 50 per cent of the

cargoes to be carried in vessels of the recipient country . . . . ."

In 1934 the Attorney General found that the "sense of Congress" language indicated that the statutory requirement of 15 U.S.C. 616a was to be carried out "only if feasible to do so." 37 Op.Att'y Gen. 546 (1934).

In view of the legislative history of this and other statutes and because the expression "sense of Congress" connotates a *policy* rather than a *directory* statement, it is my view that the Secretary of Transportation has the power to defer the availability to the states of those funds authorized and apportioned for highway construction which have not become the subject of a contractual obligation on the part of the Federal Government in favor of a state.

I must therefore dissent.

## ON PETITION FOR REHEARING AND SUGGESTION FOR REHEARING EN BANC

### PER CURIAM.

The petition for rehearing *en banc* is denied pursuant to Rule 35(b), Fed.R. App.P.

On motion for rehearing the Secretary of Transportation and the Director of the Office of Management and Budget urge, *inter alia,* that the case before us is moot. This issue was raised in their original briefs. At oral argument the following colloquy took place between the court and their counsel:

> "Q. (by the court) I am a little troubled by your lengthy discussion

---

'While our statutory system of fund apportionment is not a substitute for item or blanket veto power, and should not be used to set aside or nullify the expressed will of Congress, I cannot believe that you or Congress as a whole would take exception to either of these purposes which are common to sound business management everywhere. In other words, the mere fact that Congress, by the appropriation process, has made available specified sums for the various programs and functions of

the Government is not a mandate that such funds must be fully expended. Such a premise would take from the Chief Executive every incentive for good management and the practice of commonsense economy. This is particularly true in times of rapid change in general economic conditions and with respect to programs and activities in which exact standards or levels of operation are not and cannot well be prescribed by statute." ' 42 Op. Att'y Gen 32 (1967).

as to the fact that all of this money that has been deferred has now been allocated such that Missouri can—has obligated all of the funds available. Are you suggesting that there is an issue here of mootness or justiciability.

"A. (Mr. Appler) No, Your Honor, we are not. We gave a great deal of thought to arguing mootness in this particular case, but we ultimately decided perhaps this is the time to get this case finally decided. . . .

. . . .

"Q. (by the court) As I recall, part of the prayer here was in the form of a declaratory action. Is that right?

"A. (Mr. Appler) That's right. I presume that it cannot be done in the future. To that extent I would suppose there is still some controversy between the parties. It may be that those controls would not be imposed in the future, but presumably they have been in the past and economic conditions being what they were, I think we can fairly assume they will be—will be imposed in the future."

■ The government also suggests that relief should be denied plaintiffs by reason of sovereign immunity. This allegation is raised for the first time on appeal in the government's petition for rehearing (via a footnote) and consequently has not been fully addressed by either of the parties. Notwithstanding, because of its serious implications, we have given careful consideration to the issue. We nevertheless reject this claim. In Larson v. Domestic & Foreign Corp., 337 U.S. 682, 689, 69 S.Ct. 1457, 93 L.

Ed. 1628 (1949), it was held that suits against governmental officers are not barred by sovereign immunity where the officer being sued is alleged to have acted beyond his statutory powers. See also Dugan v. Rank, 372 U.S. 609, 621, 83 S.Ct. 999, 10 L.Ed.2d 15 (1963). This, of course, is the thrust of plaintiff's complaint and the basis of this court's opinion wherein we hold that the Secretary and the Director have no implied or express authority to impound funds under the Federal-Aid Highway Act for purposes not directly related to the Act itself.

■ However, a caveat was raised in *Larson* by the controversial[1] dictum which reads:

"Of course, a suit may fail, as one against the sovereign, even if it is claimed that the officer being sued has acted unconstitutionally or beyond his statutory powers, if the relief requested cannot be granted by merely ordering the cessation of the conduct complained of but will require affirmative action by the sovereign or the disposition of unquestionably sovereign property. North Carolina v. Temple, 134 U.S. 22, 10 S.Ct. 509, 33 L.Ed. 849 (1890)." 337 U.S. at 691 n. 11, 69 S.Ct. at 1462.

Notwithstanding, we do not consider the court's decree in the instant case as being affirmative in nature. It requires only that the defendant officers cease unauthorized action. Cf. Rockbridge v. Lincoln, 449 F.2d 567, 573 (9 Cir. 1971). The resultant release of funds is only to the extent that Congress has already authorized them to be appropriated and expended. See Local 2677, The American Federation of Government Em-

---

1. Compare State of Washington v. Udall, 417 F.2d 1310 (9 Cir. 1969) and Penn v. United States, 350 F.Supp. 752, 755 (M.D.Ala.1972) with Knight v. State of New York, 443 F.2d 415, 420–421 (2 Cir. 1971). See also Davis, Administrative Law Treatise, § 27.00-2 (1970 Supp.) ; Jaffe, Judicial Control of Administrative Action 226–227 (1965) ; Byse, Proposed Reforms in Federal "Non-statutory" Judicial Review: Sovereign Immunity, Indispensable Parties, Mandamus, 75 Harv.L.Rev. 1479, 1484 (1962) ; Cramton Nonstatutory Review of Federal Administrative Action: The Need for Statutory Reform of Sovereign Immunity, Subject Matter Jurisdiction, and Parties Defendant, 68 Mich.L.Rev. 387, 404 (1970).

ployees v. Phillips, 358 F.Supp. 60 (D.D.C.1973); City of New York v. Ruckelshaus, 358 F.Supp. 669 (D.D.C.1973).

■ As has been observed, "[a]n agency may not finally decide the limits of its statutory power. That is a judicial function." Social Security Board v. Nierotko, 327 U.S. 358, 369, 66 S.Ct. 637, 643, 90 L.Ed. 718 (1946). See also Stark v. Wickard, 321 U.S. 288, 309–310, 64 S.Ct. 559, 88 L.Ed. 733 (1944).

The petition for rehearing is denied.