Phyllis SCHLAFLY et al., Plaintiffs-Appellants,

v.

John A. VOLPE, Secretary of Transportation, et al., Defendants-Appellees.

No. 72–1502.

United States Court of Appeals, Seventh Circuit.

Argued Feb. 13, 1973.

Decided Feb. 28, 1974.

274

John F. Schlafly, Alton, Ill., for plaintiffs-appellants.

Robert A. Tingler, Asst. Atty. Gen., Chicago, Ill., William J. Scott, Atty. Gen., William P. Ryan, Springfield, Ill., David L. Norman, Asst. Atty. Gen., Denis F. Gordon, Atty., Dept. of Justice, Washington, D. C., Donald B. Mackay, U. S. Atty., Springfield, Ill., for defendants-appellees.

Before FAIRCHILD and PELL, Circuit Judges, and CAMPBELL, Senior District Judge.*

CAMPBELL, Senior District Judge.

This suit challenges the legality of the suspension of federal funding applicable to certain highway construction projects in Madison County, Illinois, and the closing of several other Madison highway projects by Illinois officials. Plaintiffs appeal from an order granting defendants' motions to dismiss. With respect to the federal officials named as defendants, the district court ruled that it had "no jurisdiction under the doctrine of sovereign immunity to order expenditure of federal funds or other such relief against government officials acting in their official capacity." Regarding the state officials named as defendants, William Cellini and Richard Golterman, the district court found that Count I of the complaint failed to state a cause of action and that Count II had been rendered moot by S. I. B. A. v. Ogilvie, 327 F.Supp. 1154 (S.D.Ill.1971), aff'd 471 F.2d 680 (7th Cir. 1972). We reverse

---

* Senior Judge William Campbell of the United States District Court for the Northern District of Illinois is sitting by designation.

the dismissal of the federal defendants and affirm the dismissal of the state defendants.

Count I of the complaint alleges that plaintiffs are residents and taxpayers of Madison County, Illinois, and that on July 5, 1968 the Federal Highway Administrator of the Department of Transportation caused a written order to issue to the Illinois Department of Public Works and Buildings directing that all new federal-aid construction contract authorizations in Madison County be withheld. Among the reasons stated for this "freeze order" was the "failure to achieve substantial improvement in compliance with Federal laws and directives with reference to equal employment opportunity in the East St. Louis area."

Count I alleges that pursuant to this order, all work was stopped for approximately two years on some fifteen highway and bridge construction projects which had previously been approved by the Secretary of Transportation. Plaintiffs contend that the "freeze order" was unlawful because it was not issued in compliance with the conditions set forth in Section 602 of the Civil Rights Act of 1964, 42 U.S.C. § 2000d-1,[1] and that the order constituted a breach of the contractual obligations which plaintiffs contend were created upon approval by the Secretary of Transportation of the construction projects in question.

With respect to the Illinois officials named as defendants, Count II alleges that on January 20, 1971, Cellini and Golterman directed the closing of four other highway projects, financed in part by federal-aid funds, because of the "failure to have the required number of minority trainees on the job." Again, plaintiffs allege that this action was unlawful because it was not taken in compliance with the provisions of § 602 of the Civil Rights Act of 1964.

42 U.S.C. § 2000d (§ 601 of the Civil Rights Act of 1964) provides that:

"No person in the United States shall, on the ground of race, color or national origin, be excluded from participation in, be denied the benefit of, or be subjected to discrimination under any program or activity receiving federal financial assistance."

42 U.S.C. § 2000d-1 (§ 602 of the Civil Rights Act of 1964) directs federal departments and agencies empowered to extend federal financial assistance to any program or activity to "effectuate the provisions of section 2000d of this title . . . by issuing rules, regulations or orders of general applicability which shall be consistent with the achievement of the objectives of the statute authorizing the financial assistance . . . " .

§ 2000d-1 requires that such rules, regulations and orders shall be effective only upon approval of the President. It provides that compliance with any requirement so adopted may be effected:

"(1) by the termination of or refusal to grant or to continue assistance . . . to any recipient as to whom there has been an express finding on the record, after opportunity for hearing, of a failure to comply with such requirement, but such termination . . . shall be limited to the particular political entity, or part thereof, or other recipient as to whom such a finding has been made and, shall be limited in its effect to the particular

---

1. Section 602 of the Civil Rights Act of 1964 provides authority for the suspension or termination of federal financial assistance to any recipient failing to comply with rules, regulations or orders issued by a department or agency for the purpose of effectuating Section 601 of the Act (42 U.S.C. § 2000d), prohibiting racial discrimination under Federally assisted programs.

Section 602 also sets forth certain requirements and conditions precedent to the issuance of such regulations and the suspension or termination of financial assistance. Plaintiffs complain that many of these requirements and conditions were not satisfied prior to the suspension of financial assistance in the instant case.

program, or part thereof, in which such non-compliance has been so found . . . ."

Before termination of federal assistance under § 2000d–1 may become effective, the statute requires that the department or agency concerned must have advised "the appropriate person or persons of the failure to comply with the requirement" and must have determined "that compliance cannot be secured by voluntary means . . . .".

Finally, § 2000d–1 provides that no such agency action shall become effective until thirty days after the head of the federal department concerned has filed "with the committees of the House and Senate having legislative jurisdiction over the program or activity involved a full written report of the circumstances and the grounds for such action."

The complaint alleges that several of these conditions precedent to the termination of federal assistance were not satisfied prior to issuance of the July 5, 1968 "freeze order," and that the order was therefore unlawful. The defendants respond, *inter alia,* that plaintiffs lack standing to sue; that because the freeze order has since been cancelled, the issue is moot; and that plaintiffs' claim is barred by operation of the doctrine of sovereign immunity, since the relief sought by plaintiffs includes the expenditure of federal highway funds.

## I. THE FEDERAL DEFENDANTS.
### (A) MOOTNESS

■ Defendants' claim that the issues presented are moot may ultimately be established, but it cannot be sustained upon a motion to dismiss. Whether the alleged unlawful action by

federal officials did, in fact, result in the loss of funds, and whether the construction projects involved have actually been resumed without any attendant loss of funds, are representative of the factual issues which clearly affect any determination of whether plaintiffs' claims were mooted by cancellation of the "freeze order" on June 3, 1970. The district court apparently recognized the inappropriateness of dismissing this action as moot on the strength of the present record, and relied instead on the doctrine of sovereign immunity as the basis for dismissal.

### (B) STANDING

■ Under § 209 of the Federal-Aid Highway Act of 1956,[2] the "Highway Trust Fund" was created. The Act provides that specified percentages of highway taxes, (*e. g.*, taxes on gasoline, diesel fuel, tires, etc.) shall be appropriated to the Highway Trust Fund; these funds are then used to reimburse the various states for expenditures under the Federal-Aid Highway Act, 23 U.S.C. § 101 et seq. The complaint alleges that plaintiffs are residents and taxpayers of Madison County, that four cents of the per gallon price of gasoline purchased by them is paid into the Highway Trust Fund, and that the funds which were suspended pursuant to the "freeze order" of July 5, 1968 were payable from the Highway Trust Fund for the construction projects in question. Plaintiffs argue that because taxes which they are obliged to pay are used to fund the highway projects subject to the "freeze order," they are "aggrieved" persons within the meaning of § 603 of the Civil Rights Act of 1964, 42 U.S.C. § 2000d–2,[3] and therefore have standing to sue.

---

2. 23 U.S.C. § 120 note.

3. 42 U.S.C. § 2000d–2 provides, in part:
"Any . . . action taken pursuant to section 2000d–1 . . . shall be subject to such judicial review as may otherwise be provided by law for similar action taken by such department or agency on other grounds. In the case of action, not otherwise subject to judicial re-

view, terminating . . . financial assistance upon a finding of failure to comply with any requirement imposed pursuant to section 2000d–1 . . ., any person aggrieved . . . may obtain judicial review of such action in accordance with [the provisions of the Administrative Procedure Act. 5 USC § 701, et seq.] . . . . ."

In Flast v. Cohen, 392 U.S. 83, 88 S. Ct. 1942, 20 L.Ed.2d 947 (1968), the Supreme Court thoroughly examined the concept of standing in the context of taxpayer suits, stating that "the question of standing is related only to whether the dispute sought to be adjudicated will be presented in an adversary context and in a form historically viewed as capable of judicial resolution." 392 U.S. at 101, 88 S.Ct. at 1953. The test enunciated in *Flast* to determine "the circumstances under which a federal taxpayer will be deemed to have the personal stake and interest that impart the necessary concrete adverseness to such litigation" 392 U.S. at 101, 88 S.Ct. at 1953, was subsequently adopted in a somewhat modified form in two cases which, unlike *Flast*, were not concerned with the constitutionality of a federal statute, Data Processing Service v. Camp, 397 U.S. 150, 90 S.Ct. 827, 25 L. Ed.2d 184 (1970) and Barlow v. Collins, 397 U.S. 159, 90 S.Ct. 832, 25 L.Ed.2d 192 (1970). Justice Douglas, speaking for the Court, viewed the issue of standing in those cases as involving two separate but related questions:

(1) "The first question is whether the plaintiff alleges that the challenged action has caused him injury in fact, economic or otherwise." 397 U.S. at 152, 90 S.Ct. at 829.

(2) The second question concerns "whether the interest sought to be protected by the complainant is arguably within the zone of interests to be protected or regulated by the statute . . . in question." 397 U.S. at 153, 90 S. Ct. at 830.

In the instant case, plaintiffs' payment of taxes specifically ear-marked for the Highway Trust Fund, the subsequent suspension in payment of such funds for all highway construction projects in the county wherein plaintiffs reside, and the allegation that the "freeze order" suspending the funds was illegal, combine to satisfy both criteria enunciated in *Data Processing* and *Barlow*. Plaintiffs have clearly suffered an alleged economic "injury" through the payment of fuel taxes, as well as noneconomic injury owing to the loss of improved highways on which to travel. We are also satisfied that the interests sought to be protected are within the "zone of interests" to be protected under the Civil Rights Act of 1964, particularly since 42 U.S.C. § 2000d–2 provides for judicial review on behalf of "any person aggrieved" by action taken pursuant to § 2000d–1. In so providing, § 2000d–2 includes within the zone of interests to be protected the interests of virtually all persons satisfying the first requirement of standing, for if the challenged action has injured plaintiffs, economically or otherwise, they must be considered persons "aggrieved" within the meaning of § 2000d–2.

### (C) SOVEREIGN IMMUNITY

The defendants' assertion that this action is barred by the doctrine of sovereign immunity compels us to examine one of the more ill-defined aspects of federal jurisdiction. Perhaps the only irrefutable statement that can be made regarding this doctrine is that it appears to offer something for everyone. In anticipation of the government's cry that the sovereign cannot be sued without consent, complaints are drawn with a covetous eye on the doctrine's "exceptions," only to be confronted with assertions that the facts present an "exception to the exception," Zapata v. Smith, 437 F.2d 1024 (5th Cir. 1971), or "qualify" the exceptions, Knight v. State of New York, 443 F.2d 415 (2nd Cir. 1971), or that entertainment of the plaintiff's claim would create an "intolerable burden on governmental functions," requiring use of the doctrine despite its otherwise applicable exceptions, State of Washington v. Udall, 417 F.2d 1310 (9th Cir. 1969). Warnings that absent sovereign immunity, government would be "stopped in its tracks," Larson v. Domestic and Foreign Commerce Corp., 337 U.S. 682, 704, 69 S.Ct. 1457,

93 L.Ed. 1628 (1948), are countered with no less persuasive arguments that "only upon a showing of 'clear and convincing evidence' of a contrary legislative intent should the courts restrict access to judicial review." Abbott Laboratories v. Gardner, 387 U.S. 136, 141, 87 S.Ct. 1507, 1511, 18 L.Ed.2d 681 (1967).

As Judge Winter noted in Littell v. Morton, 445 F.2d 1207, 1212 (4th Cir. 1971), "the authorities are not reconcilable, and there are conceptual conflicts in various holdings . . .". Judge McGowan's remarks in Knox Hill Tenant Council v. Washington, 145 U.S.App.D.C. 122, 448 F.2d 1045, 1051 (1971) are equally appropriate:

"The doctrine itself is in a considerable state of disrepair, at least in terms of intellectual respectability; and it is hardly in the original condition of pristine purity which once made it such a useful tool for Government lawyers seeking to dispense with trials on the merits."

The conceptual conflicts and lack of intellectual respectability referred to by Judges Winter and McGowan are best understood with reference to the leading Supreme Court cases and pertinent Courts of Appeals decisions.

Larson v. Domestic and Foreign Commerce Corp., 337 U.S. 682, 69 S.Ct. 1457, 93 L.Ed. 1628 (1948), relied upon by the district court in the instant case, involved a suit against the War Assets Administrator. The Court held that, because the relief sought involved the disposition of property of the United States, the action was one against the sovereign and, applying the doctrine of sovereign immunity, the Court affirmed dismissal of the suit. The Court noted that:

"the area of controversy is entered when the suit is not one for damages but for specific relief: i. e., the recovery of specific property or monies, ejectment from land, or injunction either directing or restraining the defendant officer's actions. In each

such case the question is directly posed as to whether, by obtaining relief against the officer, relief will not, in effect, be obtained against the sovereign." 337 U.S. at 688, 69 S.Ct. at 1460.

The Court then set forth two exceptions to the doctrine's applicability:

(1) "[W]here the officer's powers are limited by statute, his actions beyond those limitations are considered individual and not sovereign actions . . . . His actions are *ultra vires* his authority and therefore may be made the object of specific relief." 337 U.S. at 689, 69 S.Ct. at 1461.

(2) "A second type of case is that in which the statute or order conferring power upon the officer to take action in the sovereign's name is claimed to be unconstitutional." 337 U.S. at 690, 69 S.Ct. at 1461.

In what has become *Larson's* famous and debatable footnote 11, the court added:

"Of course, a suit may fail, as one against the sovereign, even if it is claimed that the officer being sued has acted unconstitutionally or beyond his statutory powers, if the relief . . . will require affirmative action by the soverign or the disposition of unquestionably sovereign property . . .". 337 U.S. at 691, 69 S.Ct. at 1462.

*Larson* was subsequently followed in Malone v. Bowdoin, 369 U.S. 643, 82 S. Ct. 980, 8 L.Ed.2d 168 (1962), wherein the court found neither of the *Larson* exceptions applicable and therefore directed that an action of ejectment against a Department of Agriculture official be dismissed.

The following year, the Court decided Dugan v. Rank, 372 U.S. 609, 83 S.Ct. 999, 10 L.Ed.2d 15 (1963), a suit for injunctive relief by water rights claimants against officials of the U. S. Bureau of Reclamation. The Court held the action to be one against the United States, cit-

ing the "general rule" that a suit is one against the sovereign "if 'the judgment sought would expend itself on the public treasury or domain, or interfere with the public administration,' . . . or if the effect of the judgment would be 'to restrain the Government from acting, or to compel it to act,' . . .". 372 U.S. at 620, 83 S.Ct. at 1006.

The Court further held that, under the facts in *Dugan*, the federal official's conduct did not fall "within either of the recognized exceptions to the above general rule . . . . Those exceptions are (1) action by officers beyond their statutory powers and (2) even though within the scope of their authority, the powers themselves or the manners in which they are exercised are constitutionally void." 372 U.S. at 621–622, 83 S.Ct. at 1007.

█ Although the instant case purports to assert a claim against federal officials, and not directly against the United States, it quite clearly involves a suit against the sovereign. The relief sought contemplates that funds allegedly diverted as a result of the 1968 "freeze order" be restored and made available for the construction of certain highway projects previously approved by the Secretary of Transportation.

Since the "judgment sought would expend itself on the public treasury or domain," Land v. Dollar, 330 U.S. 731, 738, 67 S.Ct. 1009, 1012, 91 L.Ed. 1209 (1947), the fact that the United States is not named as a party is irrelevant to the question of whether this action is one against the sovereign. Accordingly, the doctrine of sovereign immunity operates to deprive the court of jurisdiction unless (1) the defendants have acted beyond their statutory powers, (2) the powers exercised by the defendants (or the manner in which they were exercised) are constitutionally void, or (3) the government has consented to be sued.

In the instant case, plaintiffs have clearly alleged *ultra vires* conduct on the part of federal officials. The substance of Count I of the complaint is that the action taken by the defendants was beyond their statutory authority, since termination of federal assistance is not authorized by 42 U.S.C. § 2000d–1 unless the conditions precedent to such action have been satisfied. But the implications of *Larson's* footnote 11, as construed by various Courts of Appeals, serve to confuse what might otherwise be a simple process of logical deduction.

As previously indicated, footnote 11 advised that "a suit may fail" even though federal officials have acted in an *ultra vires* manner, if the relief sought "will require affirmative action by the sovereign." In reliance upon the language of footnote 11, some courts have held the doctrine applicable in any instance in which the relief sought contemplates affirmative action by the sovereign or the disposition of sovereign property. For example, in Knight v. State of New York, 443 F.2d 415 (2nd Cir. 1971), the court reasoned that footnote 11 "qualified" the exceptions set forth in the main body of the *Larson* Opinion, and held that where the relief sought would have required the disposition of sovereign property, the doctrine of sovereign immunity was applicable. Similarly, the Fifth Circuit has held, under like circumstances, that footnote 11 represents "a well recognized exception to the exception which applies to this case . . .". Zapata v. Smith, 437 F.2d 1024, 1025 (5th Cir. 1971).

The inclination to close the courthouse doors to litigants solely because affirmative action may be required on the part of the government, however, is not as "well recognized" as the *Zapata* decision implies. In Knox Hill Tenant Council v. Washington, 145 U.S.App.D.C. 122, 448 F.2d 1045 (1971) and State Highway Commission of Missouri v. Volpe, 479 F.2d 1099 (8th Cir. 1973), the courts reasoned that "affirmative relief" was not being sought; rather, the cessation of unauthorized conduct by federal officials was held to be the object in each case. The language of footnote 11 was therefore found inapposite. While this

reasoning may have achieved a desired result, it lends credence to Judge McGowan's concern regarding the doctrine's lack of "intellectual respectability," particularly considering the fact that in *Volpe*, the relief sought was, as here, the restoration of federal highway construction funds.

A better reasoned approach to this problem is reflected in State of Washington v. Udall, 417 F.2d 1310 (9th Cir. 1969), wherein the State of Washington sought to obtain judicial review of an administrative decision by the Secretary of the Interior that Washington was not entitled to the delivery of water from the Columbia Basin Project to more than 160 acres of certain state-owned lands.

The *Udall* court reasoned that "a suit may fail," does not mean that a suit *must* fail, and ruled that *Larson* "indicated no intent to overrule a long line of cases wherein such relief was granted against the Government." 417 F.2d at 1317. See cases cited at 417 F.2d 1317 and 1318.

The *Udall* court concluded that footnote 11 envisioned the possibility of applying the doctrine of sovereign immunity, even though the official's alleged conduct is *ultra vires*, where "the relief sought would work an intolerable burden on governmental functions, outweighing any consideration of private harm." 417 F.2d at 1318. The court found no such intolerable burden in *Udall*.

■ We consider the reasoning in *Udall* persuasive, primarily on the basis of Dugan v. Rank, 372 U.S. 609, 83 S.Ct. 999, 10 L.Ed.2d 15 (1963). *Dugan* cited *Larson* for the "general rule" that sovereign immunity is a bar "if 'the judgment sought would expend itself on the public treasury or domain' . . .". 372 U.S. at 620, 83 S.Ct. at 1006. *Dugan* then noted the "recognized exceptions to the . . . general rule," in-cluding "action by officers beyond their statutory powers." To hold that the prospect of requiring the expenditure of federal funds nonetheless creates an "exception to the exception" would invite a thoroughly circular and untenable application of the doctrine. Accordingly, we construe footnote 11 as recognizing that the doctrine *may* bar a suit in exceptional cases (*i. e.*, where to do otherwise would impose "an intolerable burden on governmental functions, outweighing any consideration of private harm"). This seems to us to represent a far more reasonable view.

■ As in *Udall*, we find no such intolerable burden in the instant case. The construction projects involved here were all allegedly approved by the Secretary of Transportation prior to the issuance of the "freeze order." Pursuant to 23 U.S.C. § 106, the Secretary's approval created "a contractual obligation of the Federal Government for the payment of its proportional contribution thereto." State Highway Commission of Missouri v. Volpe, 479 F.2d 1099, 1108 (8th Cir. 1973). The single source from which this contractual obligation can be satisfied is the Highway Trust Fund. As the *Volpe* court noted, the "resultant release of funds is only to the extent that Congress has already authorized them to be appropriated and expended." 479 F.2d at 1123.

■■ The doctrine of sovereign immunity is also inapplicable, of course, where the government has consented to be sued. But even this self-evident proposition assumes a measure of vagueness when considered in terms of what constitutes consent, an issue which has often been raised in terms of the Administrative Procedure Act.[4] Section 702 of the Act provides that a "person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." [5]

---

4. 5 U.S.C. § 701 et seq.

5. 5 U.S.C. § 702.

Section 704 provides, in part, that agency action "made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review." [6] And Section 701(a) provides that the APA applies in all cases except to the extent that:

"(1) statutes preclude judicial review; or

(2) agency action is committed to agency discretion by law." [7]

One question regarding which there exists a clear conflict among the Circuits is whether the APA constitutes a waiver of sovereign immunity. The Second Circuit has so held in Kletschka v. Driver, 411 F.2d 436 (2d Cir. 1969),[8] as has the Court of Appeals for the District of Columbia in Scanwell Laboratories v. Shaffer, 137 U.S.App.D.C. 371, 424 F.2d 859 (1970).[9] Estrada v. Ahrens, 296 F.2d 690 (5th Cir. 1961), held that the APA "makes a clear waiver of sovereign immunity in actions to which it applies," 296 F.2d at 698, but the Fifth Circuit apparently abandoned this position in Colson v. Hickel, 428 F.2d 1046 (5th Cir. 1970), without expressly overruling *Estrada*. The First,[10] Fourth,[11] Eighth,[12] Ninth,[13] and Tenth Circuits [14] have held that the APA does not constitute a waiver of sovereign immunity.

To the extent that the Supreme Court has thus far considered the impact of the APA upon the jurisdiction of federal courts to review agency decisions, little guidance has been given. In Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971); [15] Barlow v. Collins, 397 U.S. 159, 90 S.Ct. 832, 25 L.Ed.2d 192 (1970); Data Processing Service v. Camp, 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970); and Abbott Laboratories v. Gardner, 387 U.S. 136, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967), the APA was held applicable and administrative decisions were held reviewable. While none of these cases involved the expenditure of federal funds or the transfer of government property, the absence in each case of any discussion regarding sovereign immunity is unfortunate, particularly since *Larson, Malone* and *Dugan* were each decided after enactment of the APA without any mention of its provisions. In each of latter cases, judicial review of agency action was prohibited by application of the doctrine of sovereign immunity.

The need for a definite statement by the Supreme Court regarding the impact

6. 5 U.S.C. § 704.

7. 5 U.S.C. § 701.

8. "Furthermore, the A.P.A. constitutes a waiver of sovereign immunity concerning those claims which come within its scope." 411 F.2d at 445.

9. "It seems axiomatic to us that one must imply, from a statement by the Congress that judicial review of agency action will be granted, an intention on the part of Congress to waive the right of sovereign immunity; any other construction would make the review provisions illusory." 424 F.2d at 874.

10. Cyrus v. United States, 226 F.2d 416 (1st Cir. 1955).

11. Littell v. Morton, 445 F.2d 1207 (4th Cir. 1971).

12. Twin Cities Chippewa Tribal Council v. Minnesota Chippewa Tribe, 370 F.2d 529, 532 (8th Cir. 1967).

13. State of Washington v. Udall, 417 F.2d 1310 (9th Cir. 1969).

14. Motah v. United States, 402 F.2d 1 (10th Cir. 1968).

15. Without any mention of sovereign immunity, the Court stated:
"A threshold question—whether petitioners are entitled to any judicial review—is easily answered. Section 701 of the Administrative Procedure Act, 5 U.S.C. § 701 . . . ., provides that the action of 'each authority of the Government of the United States,' which includes the Department of Transportation, is subject to judicial review except when there is a statutory prohibition on review or where 'agency action is committed to agency discretion by law.'" 401 U.S. at 410, 91 S.Ct. at 820.

of the APA on the doctrine's continued viability was well stated in Littell v. Morton, *supra:*

"Our task is magnified because we have been unable to find any case in which the Supreme Court has sought to reconcile the notion of sovereign immunity with the fundamental concept of the APA that a person adversely affected by administrative action is presumptively entitled to judicial review of its correctness." 445 F.2d at 1212.

It may be that the APA, standing alone, does not represent a waiver of sovereign immunity, but where, as here, the statute which defines the government's authority to take specific action also provides for judicial review of such action in accordance with the provisions of the APA, we believe the sovereign has consented to be sued. 42 U.S.C. § 2000d–1 provides both the authority for and the conditions precedent to the suspension of federal assistance. 42 U.S.C. § 2000d–2 provides that "any person aggrieved . . . may obtain judicial review" of agency action which results in the suspension of federal financial assistance, in accordance with the provisions of the APA. It further provides that such agency action "shall not be deemed committed to unreviewable agency discretion," thus precluding one of the exceptions to the applicability of the APA set forth in section 701(a) of the Act.

The clear intent of section 2000d–2 is to provide a forum for judicial review for persons aggrieved by the severe action authorized by § 2000d–1. It incorporates the provisions of the APA for the purpose of facilitating judicial review, but does not incorporate whatever limitations may be imposed upon the Act by the doctrine of sovereign immunity, since the government's consent to be sued does not emanate from the APA, but rather from the very statute which provides authority for the challenged agency action.

Accordingly, having found that the government has waived sovereign immunity and, in any event, that the *ultra vires* exception renders the doctrine inapplicable, plaintiff's action against these federal defendants is not barred by the doctrine of sovereign immunity.

The remaining contentions regarding dismissal of the federal defendants are easily resolved. It is asserted first that the authority of federal officials to suspend federal assistance is also authorized by Executive Order No. 11246,[16] and that the Order has the same weight and sufficiency as that of a statute.

Part III of E.O. 11246 pertains to nondiscriminatory provisions in federally assisted construction contracts and prescribes the steps which must be taken by applicants as a condition to receipt of financial assistance. Section 303(b) provides for the suspension of financial aid in the event an applicant "fails and refuses to comply with his undertakings."

The Order, however, is no less compelling than is the Civil Rights Act of 1964 with respect to the limitations imposed upon federal agencies in connection with the suspension of federal financial assistance. Section 303(c) provides that

"Any action with respect to an applicant pursuant to Subsection (b) shall be taken in conformity with Section 602 of the Civil Rights Act of 1964 [42 U.S.C. § 2000d–1(b)] . . . to the extent applicable. In no case shall action be taken with respect to an applicant pursuant to Clause (1) or (2) of Subsection (b) [*i. e.,* regarding suspension of or the refusal to extend financial assistance] without notice and opportunity for hearing before the . . . department or agency."

Section 304 of the Order also provides that "actions to effect compliance by recipients of Federal financial assistance with requirements imposed pursuant to Title VI of the Civil Rights Act of 1964 . . . shall be taken in conformity

16. 42 U.S.C. § 2000e, note.

with the procedures and limitations prescribed in Section 602 thereof . . .".

In view of the foregoing, we see no distinction between action taken by a federal agency pursuant to 42 U.S.C. § 2000d–1 and that taken pursuant to Executive Order No. 11246.

For some reason, the defendants argue that the "Civil Rights Act was not extended to federally funded highway construction until enactment of Section 140 of Title 23 of the Federal Aid Highway Act . . . on August 23, 1968 . . . and . . . at the time of the advent of the alleged freeze, equal employment opportunity . . . did not apply as complained of by the Plaintiffs-Appellants herein." [17] The language of Executive Order No. 11246, Part III, would certainly indicate to the contrary, but more fundamentally, the legality of suspending federal funds in July of 1968 for previously approved construction projects would certainly be suspect but for the fact that 42 U.S.C. § 2000d–1 provides the authority for such action.

Defendants' apparent purpose in relying upon 23 U.S.C. § 140 is to avoid the attendant conditions imposed by § 2000d–1. Section 140 provides that the Secretary of Transportation shall require that employment in connection with proposed highway projects be provided without regard to race, color, creed or national origin and simply clarifies the Secretary's responsibility to obtain assurances of non-discrimination "prior to approving any program." Nothing in Section 140 implies that the conditions set forth in § 2000d–1 are not applicable to actions taken by the Secretary of Transportation which result in the suspension of financial assistance.

### (II)   STATE OFFICIALS

Count II of the complaint challenges the legality of an order dated January 22, 1971 which was caused to be issued by defendants Cellini and Golterman closing four highway construction projects in Madison County for "failure to have the required number of minority trainees on the job." Plaintiffs assert that there is "no Federal or state law which empowers or authorizes the defendants to prescribe a required number of minority trainees on any job or to close down a job because of the absence of such trainees." As in Count I, plaintiffs allege that the failure to satisfy the conditions set forth in Section 602 of the Civil Rights Act of 1964 [18] renders the state officials' actions unlawful.

Regarding plaintiffs' contention that no federal or state law exists which authorizes these defendants to prescribe a required number of minority trainees to be employed by a contractor in connection with highway construction projects, little need be added to the excellent opinions authored by Judge Poos and Judge Sprecher in the "Ogilvie Cases," S.I.B.A. v. Ogilvie, 327 F.Supp. 1154 (S.D.Ill. 1971), aff'd 471 F.2d 680 (7th Cir. 1972) upholding the legality of the socalled Ogilvie Plan.[19]

These opinions describe in detail "the inequality of minority representation in the highway construction industry with respect to the defendant unions." 327 F.Supp. at 1157. Judge Poos viewed the Ogilvie Plan as "a realistic plan which realistically promises to work immediately. It provides a starting point by assuring that certain minorities are provided an equal employment opportunity." 327 F.Supp. at 1159.

Authority for adoption of the Ogilvie Plan was described by Judge Sprecher as follows:

"Section 22(a) of the Federal Aid Highway Act of 1968 (23 U.S.C. § 140) requires the State of Illinois to adopt the Ogilvie Plan or one substantially like it with apprenticeship

---

17. Brief and Argument for Defendants-Appellees State Officials, p. 8.

18. 42 U.S.C. § 2000d–1.

19. "An Agreement to Facilitate Equal Employment Opportunities in State Highway Construction in Madison and St. Claire Counties."

. . . programs without regard to race, color, creed or national origin, in order to participate in Federal-aid highway construction programs. Executive Order 11246 . . ., requires contractors desiring to participate in Federal-aid programs to take 'affirmative action' in regard to equal opportunity employment . . . .

"The obligation to take affirmative action imports more than the negative obligation not to discriminate. The Secretary of Labor is . . . authorized to 'adopt such rules, regulations and issue such orders as he deems necessary and appropriate to achieve the purposes thereof' (Sec. 201). The Secretary's regulations require that contractors develop written affirmative action plans which shall 'provide in detail for specific steps to guarantee equal employment opportunity . . . '." 471 F.2d 684.

The four highway projects referred to in Count II were closed down "for noncompliance [by the unions] with the provisions of the construction contracts relating to the Ogilvie Plan . . . ." 327 F.Supp. at 1158. Whether these projects have since been resumed is unclear from the record before us, but suffice it to say that the legality of the Ogilvie Plan and of the federal statutes and Executive Order providing the authority therefore, dispels any illusion that there exists "no federal or state law" authorizing the prescription of a required number of minority trainees in connection with federal-aid highway projects. Plaintiffs have not alleged and the record does not disclose any indication that the closing down of the projects in question was done in a manner not contemplated and authorized under the Ogilvie Plan.

■ Plaintiffs' contention that the action taken by state officials was unlawful because of their failure to fulfill the conditions set forth in Section 602 of the Civil Rights Act of 1964 is misplaced. Of critical importance is the distinction between the limited right of federal officials to suspend or terminate financial assistance to a state pursuant to Section 602, and the discretion afforded the state in allocating appropriated funds under a valid affirmative action program. Section 602 provides the authority for and the conditions precedent to the suspension or termination of federal assistance by *federal* officials. It neither empowers state officials to take such action, nor limits their right to do so pursuant to affirmative action programs authorized and developed pursuant to valid statutes or regulations, such as the Federal Aid Highway Act and the regulations issued pursuant thereto. As previously noted, the legality of the Ogilvie Plan has heretofore been upheld, and we are therefore satisfied that the district court's dismissal of Count II and the state officials on the basis of S.I.B.A. v. Ogilvie, *supra*, was correct.

Accordingly, the dismissal of Count II and the state officials named as defendants is affirmed, and dismissal of Count I and the federal officials is reversed and remanded for further proceedings consistent with the foregoing.

Affirmed in part,

Reversed in part.

---

FAIRCHILD, Circuit Judge (dissenting in part, concurring in part).

I believe that plaintiffs lack standing to challenge this suspension of federal highway funds, and that, on the allegations in the complaint, the relief sought would impinge on sovereign immunity. Therefore, I respectfully dissent from the reinstatement of the count against the federal defendants. As to the state defendants, I concur in the result.

Plaintiffs claim injury from an act of a federal official allegedly ultra vires his statutory power. With respect to standing, "[t]he first question is whether the plaintiff alleges that the challenged action has caused him injury in fact, economic or otherwise." Data Processing Service v. Camp, 397 U.S.

150, 152, 90 S.Ct. 827, 829, 25 L.Ed.2d 184 (1970). I do not agree that payment by plaintiffs of the federal motor fuel tax, proceeds of which support highway construction, amounts to an injury in fact. The tax is one of general applicability and not contingent on the expenditure of federal funds in the fuel purchaser's locality. See 26 U.S.C. §§ 4041, 4081. Plaintiffs aver that, in addition to being residents and taxpayers, one, an Association of Commerce, is a not-for-profit corporation, and one is a business manager of a union. They aver that the projects were "important" and "vitally needed." Arguably, the delays in highway improvements in the vicinity of plaintiffs' residences could constitute a type of noneconomic injury. The complaint, however, does not spell out any way in which the delay has actually harmed plaintiffs. The Supreme Court has indicated some strictness in requiring such allegations when standing depends on a claim of noneconomic injury. See Sierra Club v. Morton, 405 U.S. 727, 734–735, 92 S.Ct. 1361, 31 L. Ed.2d 636 (1972).

Moreover, even if the plaintiffs have standing, the averments of the complaint fall short of demonstrating that the relief they seek does not invade sovereign immunity. Federal officials set each state's highway allocation and may refuse to authorize particular contracts. However, the power to channel federal funds to specific projects belongs to the state. See 23 U.S.C. §§ 104–105. The plaintiffs have not alleged that the suspension of funds for Madison County construction resulted in any money being withheld in the federal treasury. Their complaint is consistent with the federal defendants' position that they paid Illinois the full amount of its allocation, but refused to permit any expenditure in Madison County. If that is the situation, plaintiffs' claim is, in essence, that defendants must obtain a new, supplementary appropriation of federal money and must direct that it be spent in Madison County. The federal defendants lack the power to direct the expenditure in Madison County. See 23

U.S.C. § 105. The appropriation of additional funds would require affirmative action and "disposition of property admittedly belonging to the United States." Such relief is outside the exception to the sovereign immunity doctrine delineated in Larson v. Domestic & Foreign Commerce Corp., 337 U.S. 682, 69 S.Ct. 1457, 93 L.Ed. 1628 (1949). See State of Hawaii v. Gordon, 373 U.S. 57, 83 S.Ct. 1052, 10 L.Ed.2d 191 (1963). As the plaintiffs have not alleged that the federal defendants control any specific funds which, but for the freeze, Illinois would have received, they have not avoided the bar of sovereign immunity.

I would affirm the district court's dismissal of the complaint.