Rosie ELLIOTT et al., Plaintiffs,

v.

Caspar W. WEINBERGER, Individually and as Secretary, United States Department of Health, Education and Welfare, et al., Defendants.

No. 75–C–360.

United States District Court, E. D. Wisconsin.

March 30, 1977.

Alexandra L. Waeffler and Steven H. Steinglass, Milwaukee Legal Services, Inc., Milwaukee, Wis., for plaintiffs.

Leah M. Lampone, Asst. U.S. Atty., Milwaukee, Wis., for federal defendants.

Ward L. Johnson, Asst. Atty. Gen., Madison, Wis., Earl G. Buehler, Atty., Div. of Family Services, State of Wis., Madison, Wis., for Wilbur J. Schmidt.

Merwin W. Kaye, Director Food and Nutrition Div., Office of Gen. Counsel, U.S. Dept. of Agriculture, Washington, D.C., for Earl L. Butz.

Robert V. Varnum, Atty., Dept. of HEW, Social Security Div., Washington, D.C., for HEW.

## MEMORANDUM AND ORDER

WARREN, District Judge.

### I. INTRODUCTION

This case presents a question arising under the Food Stamp Act and its relation to the Social Security Act. The complaint requests a review of a decision by the Secretary of Health, Education and Welfare that Wisconsin was eligible to cash out food stamps in January of 1974. Failing to attain satisfaction on that review the plaintiffs request a review of the Secretary's decision to terminate the state's cash out status on a prospective basis only in July of 1975. The plaintiffs contend that the United States is liable to them for either lost Social Security benefits or lost food stamp benefits because of those determinations.

The background for this suit involves a complicated statutory scheme as well as a set of involved facts.

### II. STATUTORY HISTORY

On October 30, 1972, Congress passed P.L. 92–603 which created the Supplemental Security Income (SSI) Program. The new program was to become effective on January 1, 1974 and would replace the old state-federal programs of public assistance—Aid to Blind, Aid to Permanently and Totally Disabled, and Old Age Assistance. The SSI provided a guaranteed basic floor of income and in addition provided that the states could supplement the federal payments in any amount they choose. The states could, also, at their option, enter into an agreement with the Secretary of HEW whereby the federal government would administer, at federal expense, the states' supplementation.

There are several provisions in the act which are designed to encourage state sup-

plementation. Section 401, the "hold harmless" provision is one. Under § 401, if the state elects to supplement, the federal government will assume the cost of any supplementation in excess of the state's share of the P.A. expenditures but only up to a certain level. That level is called the Adjusted Payment Level and is defined as the amount a totally indigent P.A. recipient received in January of 1972. APL figures had to be developed for each state.

The initial SSI program envisioned that no recipient of such funds would receive food stamps. Prior to the program becoming effective the provision relating to food stamps was amended twice. The final amendment, P.L. 93–233, § 8 allowed food stamp eligibility for all SSI recipients except those who reside in states where the optional state supplementation was found by the Secretary of HEW to have been specifically raised to include the bonus value of food stamps. The formula by which the Secretary was to make that determination is found in § 8(c).

> (c) . . . the level of state supplementary payment under section 1616(a) shall be found by the Secretary to have been specifically increased so as to include the bonus value of food stamps (1) only if, prior to October 1, 1973, the State has entered into an agreement with the Secretary or taken other positive steps which demonstrate its intention to provide supplementary payments under section 1616(a) at a level which is at least equal to the maximum level which can be determined under section 401(b)(1) of the Social Security Amendments of 1972 [the APL] and which is such that the limitations on state fiscal liability under section 401 [hold harmless] does result in a reduction in the amount which would otherwise be payable to the Secretary by the State, and (2) only with respect to such months as the State may, at its option, elect.

This amendment passed Congress on December 31, 1973, the day before the program became effective.

This amendment was by its term to be provisional only and last only for the remainder of fiscal year 1974. Subsequently on July 8, 1974 the amendment was extended to cover fiscal year 1975.

### III. FACTUAL HISTORY

The State of Wisconsin began developing figures for its APL as early as December of 1972. An agreement was reached by the State and the Social Security Administration as to the applicable APL's. The figures were based on a statistical sample of the state's caseload and was considered as provisional figures only.

Based on these figures the state entered an agreement which provided for state supplementation up to the provisional APL of $216 for an individual. The federal income floor was $130 and the state supplement was $86. The parties recognized that the APL's would be audited and readjusted if necessary.

Since § 8, providing for food stamp eligibility had been passed on December 31, 1973, the Secretary was required to determine if any of the states were eligible to "cash-out" food stamps. A decision that Wisconsin was eligible was made based on the APL of $216 and the state's express intent to supplement to that level. Wisconsin was offered the option to cash-out food stamps on January 16, 1974. The election to cash-out was made on January 18, 1974 and food stamps were discontinued in the state. The effect of the election was to maintain the APL of $216 rather than to lower it by the bonus value of food stamps since only in cash-out states could the APL figure include the bonus value.

During the spring of 1974, Wisconsin conducted a 100 percent survey of the APL figures. These figures were audited by HEW and were incorporated into the agreement between the state and the SSA for fiscal year 1975. The new APL figures were considerably higher; $272.91 for an individual. These figures remained provisional also, pending final review by the Secretary, and were transmitted to HEW by the state on the same day that Congress

extended the cash-out provision to fiscal year 1975.

On September 6, 1974 an exit conference on HEW's audit of Wisconsin's revised APL figures was conducted. The auditing agents confirmed the state's figures. On September 26, 1974 the Secretary of HEW recertified the cash-out status of Wisconsin to the Secretary of the Agriculture.

Questions became apparent as to the controlling APL figures for FY 1975, and the retroactive effect if the Secretary approved the higher APL figures. Wisconsin's cash-out status was also in doubt since it appeared that it was no longer eligible for that status.

The state on November 27, 1974 acted to increase the payment level to an individual to $228. At the same time, a vote was made to end cash out status and to reinstate the Food Stamp Program for SSI recipients. On February 3, 1975 a request was made of HEW to determine the cash out status of Wisconsin. When no decision was made, the State conveyed its desire to elect not to cash out food stamps on April 22, 1975. The election also included a request that the cash out status be terminated as of July 1, 1974.

On July 2, 1975 the Secretary communicated his decision to terminate Wisconsin's cash out status to be effective Sept. 1, 1975. This Court has previously ruled that the termination is to be effective as of July 2, 1975.

The plaintiffs' contentions boil down to this, between the dates January 1, 1974 through July 2, 1975, they were entitled to either food stamps or supplemental SSI payments up to the APL of $272.91, they have received neither. The plaintiffs can only recover if they can show that the Secretary's decisions to grant cash out status initially was improper and can be set aside or his decision not to retroactively terminate that status was improper and can be set aside.

## IV. JURISDICTION

The initial hurdle which the plaintiffs must cross is the objection that the remaining claims in this action are barred by the Eleventh Amendment or the doctrine of sovereign immunity.

The defendants have argued that the Eleventh Amendment is applicable to this case under the following argument.

The SSI Program guarantees through federal payments a basic level of income for all the aged, blind, and disabled in the nation. In addition to this basic level the states may, at their option, supplement the federal payments in any amount they choose.

The payment of state supplementation, even under federal administration, however, is still ultimately a state responsibility. The Secretary of Health, Education and Welfare, in administering the state supplementation, only makes payments to beneficiaries in a state at a level and to those categories specified in the supplementation agreement with the state. A change in the categories or payment levels can only be made pursuant to a modification of the state's agreement with the Secretary. The state, in other words, supplements only if it chooses; and it sets the level at which supplementation will be paid, and it decides what categories will receive supplementation. Finally, the state is fiscally responsible under the law for reimbursing the Secretary for supplementary payments made on its behalf.

The argument then concludes that the relief requested for retroactive payments of state supplementary benefits is a prayer for the retroactive payment of funds that are a state responsibility.

■ This argument ignores the realities of the situation. If retroactive payments of SSI benefits or retroactive food stamp benefits would be ordered by this Court it is the federal government and not the state that would bear the cost of such relief: the SSI benefits because Wisconsin has exceeded its "hold harmless" level and food stamp benefits since it is federally funded from the outset. It is the result of the judgment or decree which may be en-

tered that determines against whom the suit is brought. *See Larson v. Domestic & Foreign Commerce Corp.*, 337 U.S. 682, 69 S.Ct. 1457, 93 L.Ed. 1628 (1949); *Minnesota v. Hitchcock*, 185 U.S. 373, 22 S.Ct. 650, 46 L.Ed. 954 (1902). This action is one against the United States. If this suit is barred it is by virtue of the sovereign immunity of the federal government.

The Seventh Circuit precisely stated the issue in *Schlafly v. Volpe*, 495 F.2d 273, 279 (7th Cir. 1974).

> Since the "judgment sought would expend itself on the public treasury or domain," *Land v. Dollar*, 330 U.S. 731, 738, 67 S.Ct. 1009, 1012, 91 L.Ed. 1209 (1947), the fact that the United States is not named as a party is irrelevant to the question of whether this action is one against the sovereign. Accordingly, the doctrine of sovereign immunity operates to deprive the court of jurisdiction unless (1) the defendants have acted beyond their statutory powers, (2) the powers exercised by the defendants (or the manner in which they were exercised) are constitutionally void, or (3) the government has consented to be sued.

The Court will first examine the exception of consent. The plaintiffs have contended that immunity has been waived by three specific statutes: (1) 42 U.S.C. § 405(g)(2) 5 U.S.C. § 702 and (3) 28 U.S.C. § 1346(a)(2).

■ The argument that 42 U.S.C. § 405(g) has waived sovereign immunity in this case for retroactive SSI benefits is premised on the proposition that § 405(g) confers jurisdiction over this matter. The plaintiffs argued that the Supreme Court in *Weinberger v. Salfi*, 422 U.S. 749, 95 S.Ct. 2457, 45 L.Ed.2d 522 (1975), held that a "final decision" within § 405(g) does not always require a hearing to be conducted. While this argument has been debated by the circuit courts, the Supreme Court has recently clarified its position. In *Califano v. Sanders*, — U.S. —, 97 S.Ct. 980, 51 L.Ed.2d 192 (1977), the Court made it clear that § 405(g) conferred jurisdiction to review agency action only after "a final deci-

sion of the Secretary made *after a hearing*." Id. at —, 97 S.Ct. at 985 (emphasis added). The only exception to this rule is that expressed in *Salfi, supra,* and *Mathews v. Eldridge*, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976).

> [T]hose cases merely adhered to the well-established principle that when constitutional questions are in issue, the availability of judicial review is presumed, and we will not read a statutory scheme to take the "extraordinary" step of foreclosing jurisdiction unless Congress' intent to do so is manifested by "clear and convincing" evidence. *Califano* at —, 97 S.Ct. at 986.

The plaintiffs attack the agency action here as being *ultra vires, i. e.,* outside the scope of the statute, or as being an abuse of discretion not as being infected with any constitutional infirmity.

Section 405(g) neither confers jurisdiction nor constitutes a waiver of sovereign immunity.

■ A similar result must be reached in the case of section 702 of Title 5. While some circuit courts have found a waiver of sovereign immunity from the provisions of the Administrative Procedure Act, these decisions were premised on the fact that it contained an independent grant of subject matter jurisdiction. *See Kletschka v. Driver*, 411 F.2d 436, 445 (2d Cir. 1969) ("Furthermore, the A.P.A. constitutes a waiver of sovereign immunity concerning those claims which come within its scope."); *Sconwell Laboratories v. Shaffer*, 137 U.S. App.D.C. 234, 424 F.2d 859, 874 (1970) ("It seems axiomatic to us that one must imply, from a statement by the Congress that judicial review of agency action will be granted, an intention on the part of Congress to waive the right of sovereign immunity; any other construction would make the review provisions illusory.").

The Supreme Court has also settled this debate in *Califano v. Sanders, supra.* "We thus conclude that the APA does not afford an implied grant of subject-matter jurisdiction permitting federal judicial review of

agency action." Id. at ——, 97 S.Ct. at 985.

Section 702 neither confers jurisdiction nor constitutes a waiver of sovereign immunity.

■ The remaining statute which the plaintiff argues constitutes a waiver is 28 U.S.C. § 1346(a)(2). The plaintiffs' position is that as an alternative ground for recovery, they assert a claim for damages against the United States. As to the relief requested which would constitute SSI benefits, the action is barred by 42 U.S.C. § 405(h). "No action against the United States, the Secretary, or any officer or employee thereof shall be brought under section 41 of Title 28 to recover on any claim arising under this subchapter." Section 1346(a)(2) is covered by this provision. See Jamieson v. Weinberger, 379 F.Supp. 28, 35–36 (E.D.Penn.1974) and cases cited therein. As to the claim for damages arising under the Food Stamp Act, the complaint fails to state a claim upon which relief may be granted.

The United States Supreme Court has recently reviewed the Tucker Act in clarifying the jurisdiction of the Court of Claims. The statute reviewed, 28 U.S.C. § 1491, is identical to 28 U.S.C. § 1346(a)(2) in its substantive provisions. Both statutes grant jurisdiction in cases

> founded either upon the Constitution, or any Act of Congress, or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort.

The Supreme Court construing this statute in United States v. Testan, 424 U.S. 392, 399, 96 S.Ct. 948, 954, 47 L.Ed.2d 114 (1976), stated:

> [T]he respondents . . . argue that the Tucker Act fundamentally waives sovereign immunity with respect to any claim invoking a constitutional provision or a federal statute or regulation, and makes available any and all generally accepted and important forms of redress, including money damages.

> * * * [I]t is claimed that where there has been a violation of a substantive right, the Tucker Act waives sovereign immunity as to all measures necessary to redress that violation.

The argument does not persuade us. As stated above, the Tucker Act is merely jurisdictional and grant of a right of action must be made with specificity. The respondents do not rest their claims upon a contract; neither do they seek the return of money paid by them to the Government. It follows that the asserted entitlement to money damages depends upon whether any federal statute 'can fairly be interpreted as mandating compensation by the Federal Government for the damage sustained.' Eastport Steamship Corp. v. United States, 372 F.2d at 1009, 178 Ct.Cl., at 607; Mosca v. United States, 417 F.2d 1382, 1386, 189 Ct.Cl. 283, 290 (1969), cert. denied. 399 U.S. 911 [90 S.Ct. 2197, 26 L.Ed.2d 565] (1970) . . . . In a suit against the United States, there cannot be a right to money damages without a waiver of sovereign immunity, and we regard as unsound the * * * argument that all substantive rights of necessity create a waiver of sovereign immunity such that money damages are available to redress their violation.

See also Jackson v. Lynn, 165 U.S.App. D.C. 172, 506 F.2d 233 (D.C.Cir.1974).

The plaintiff in this case must show that the statute under which they claim "damages" mandates compensation to them. No such show has even been attempted. Nor is this Court ready to hold that § 8(c) contemplates such an action.

Having failed to state a cause of action for damages, the plaintiffs may not rest on § 1346(a)(2) as a waiver of sovereign immunity. No other basis for waiver has been offered and this Court has found no other.

The second exception to the immunity doctrine listed above is that the defendants have acted unconstitutionally. No such allegations have been made in this case.

The remaining exception is "that the defendants have acted beyond their statutory

powers." All parties to this suit have argued the applicability of footnote 11 of the Supreme Court's decision in *Larson, supra,* to the instant action. Before that issue is reached, however, there must be a determination that the Secretary exceed his power. The Ninth Circuit in *Washington v. Udall,* 417 F.2d 1310, 1316 (1969) stated:

Of course, the mere allegation that a federal officer's action is erroneous, due to a mistake of fact or law, does not necessarily constitute a claim that he was acting beyond his delegated authority. (citations omitted) Nevertheless, if the State's interpretation of 43 U.S.C. § 423e is correct, the Secretary's imposition of a 160-acre limitation does not appear to be within his delegated powers. The resolution of this issue depends on whether Congress granted to the Secretary of the Interior, in his executing of contracts for the delivery of irrigation water, the discretionary authority to make incorrect as well as correct decisions concerning the necessity for the inclusion of 160-acre limitations in the contracts. We find words of discretion in § 423e, but not as to the 160-acre limitation.

In this case as in *Schlafly v. Volpe,* 495 F.2d 273 (7th Cir. 1974), the action of the official involved was an act not within his discretion. The Secretary in *Udall* was not given the power to make the 160-acre limitation applicable to publicly held land. The Secretary in *Schlafly* was not given the power to issue the freeze order without complying with the conditions precedent thereto.

█ The Court must examine the statutes in question here and determine if Congress granted to the Secretary of HEW the power to make the decision he reached.

Section 8(c) of Public Law 93–233 states:

(c) . . . the level of state supplementary payment under section 1616(a) shall be found by the Secretary to have been specifically increased so as to include the bonus value of food stamps (1) only if, prior to October 1, 1973, the State has entered into an agreement with the Secretary or taken other positive steps which demonstrate its intention to provide supplementary payments under section 1616(a) at a level which is at least equal to the maximum level which can be determined under section 401(b)(1) of the Social Security Amendments of 1972 [the APL] and which is such that the limitations on state fiscal liability under section 401 [hold harmless] does result in a reduction in the amount which would otherwise be payable to the Secretary by the State, and (2) only with respect to such months as the State may, at its option, elect.

The plaintiffs argue that the import of this statute is that Secretary *cannot* allow a state to cash-out food stamps unless supplementary payments meet or exceed the APL. The argument then continues that the APL figures finally arrived at, exceed the supplementary payments.

The Court cannot agree with the interpretation given to the statute by the plaintiffs. The Secretary cannot allow the state to cash out food stamps unless he makes a finding that the state supplementation has been specifically raised to include the bonus value of food stamps. In order to make that finding there must be a contract or "other positive steps which demonstrate its intention to provide supplementary payments" up to the APL. The statute does not require that the APL actually be met. Nor does the logic of the statute require that the APL figure actually be met.

The cash out provision allows the state to decide whether the bonus value of food stamps will be given to the SSI recipients in the form of cash or in the form of an ability to purchase food stamps. In order to insure that the federal government and not the state is providing the funding for the bonus value of food stamps in cashed-out states, it is necessary that the state be receiving the benefits of § 401, hold harmless, and that the APL be adjusted to include the bonus value of the stamps. There is no need for the supplementary benefits to meet the APL. The cash out provision is an encouragement to the state to supplement to the

APL figure. Congress allowed the Secretary to cash out food stamps if the state expressed an intention to meet the APL.

This interpretation of the statute is borne out by the timing of the statute also. The cash out provision was enacted on December 31, 1973 and became effective on January 1, 1974. By its terms it was to last for only six months. On December 31, 1973 the APL figures were not final; they had not been audited by HEW nor had the Secretary approved the figures. Yet Congress envisioned that some states would cash out food stamps during the six-month period the statute was to be effective. This being the case, the only assumption that can be made is that Congress left the decision to allow a state to cash-out food stamps within the discretion of the Secretary and gave him the power to do so when he determined that the state had specifically increased its supplemental payments to include the bonus value of food stamps.

The Secretary had the power to make the decision he did in this instance and was acting within the statute. The fact that it later turned out that the APL figures were higher $^{t^{1}}$ first thought does not change that fact. Having decided that the Secretary was acting within his power in the initial decision to allow Wisconsin to cash out food stamps, the Court would also find that he acted within his power in deciding not to make the termination of the status retroactive.

For the reasons stated above, this action must be and hereby is DISMISSED under the doctrine of sovereign immunity.